RISING FAWN IRON CO. (WARNER v.). See Case No. 17,188.

## Case No. 11,858.

### The RISING SUN.

[1 Ware (378) 385.][1]

District Court. D. Maine.   June Term, 1837.

SALVAGE — EMBEZZLEMENT BY SALVOR — OWNER'S SHARE — TO WHOM FORFEITED SHARES GO — CLOTHING OF SALVED CREW.

1. Embezzlement by a salvor works a forfeiture of his claim of salvage, but does not prejudice his co-salvors, who are innocent.

[Cited in Cromwell v. The Island City, Case No. 3,410; The L. T. Knights, Id. 8,585; U. S. v. Stone, 8 Fed. 251.]

2. If the master and all the crew are implicated in the embezzlement, it will not work a forfeiture of the share of innocent owners of the salvor ship.

[Cited in The Missouri, Case No. 9,654.]

3. The clothing of the master and crew which is left on board a vessel when they abandon her, is not included in the mass of property on which salvage is allowed, but is restored free of charge.

4. The ancient rule of the admiralty, to allow a moiety as salvage in all cases of derelict, is no longer a binding rule. It bends to the circumstances of particular cases.

[Cited in The W. D. B., Case No. 17,306.]

5. When the shares of any salvors are forfeited, they do not accrue to their co-salvors, to increase their shares, but are reserved for the owners of the property saved.

This was a case of salvage. The schooner Albion, belonging to the libellant, on her return from a fishing voyage on the Grand Banks, on the 13th of September, 1836, fell in with the Rising Sun [Sponagle, master] about twenty miles south of Cape Sables, deserted by her crew, lying on her beam ends, and filled with water. The master and crew of the Albion took possession of her, and cut away her masts, when she righted. They found her loaded with cord-wood; and upon further examination they found money on board to the amount of one hundred dollars, with various articles of clothing which were left by her crew when they abandoned her, of about the same value. The Albion took her in tow, and the weather proving favorable, brought her into the Penobscot river, when a libel was filed by the owners of the Albion, for salvage. She proved to be a schooner belonging to Halifax, and a claim was filed by Sponagle, her late master, in behalf of the owners.

Mr. Allen, for libellants.

Fessenden & Deblois, for claimants.

WARE, District Judge. This is a case of derelict, and a clear case of salvage unless

[1] [Reported by Hon. Ashur Ware, District Judge.]

there has been a° forfeiture of the right by the misconduct of the salvors. The libel was originally filed by the owners of the Albion with the master for themselves and in behalf of the crew. The claimants object to the allowance of any salvage, alleging a forfeiture on account of the misconduct of the salvors. The misconduct alleged is the embezzlement of the money and clothing found on board, by the master and crew of the Albion. A number of depositions have been taken in support of the allegation, by which it is clearly proved that soon after the vessel was brought into a place of safety, the master and crew of the Albion took the money and clothing which they found on board, and divided it among themselves. Sponagle, the master of the Rising Sun, happened to be at Bucksport at the time, or soon after the arrival of the two vessels at that port, and having ascertained the embezzlement, applied for a warrant against those who were supposed to be concerned in the fraud, by means of which the articles purloined were eventually recovered.

There is no doubt that this embezzlement works an entire forfeiture of all claim for salvage on the part of those who participated in it. Salvage property is always from necessity more or less exposed to be plundered by the salvors, and when found derelict it is peculiarly so, because the owner has then no power to protect it by the care and oversight either of himself or his agents. It is entirely at the disposal of strangers, who usually do not even know who the owner is, and who are not ordinarily persons trained by education and habit to the most exact and punctilious notions of the distinction between meum and tuum, particularly in relation to property abandoned by the owner; and the experience of maritime commerce in all ages shows that the temptation to illicit gain in such cases is apt to be too strong for the integrity of those who are most usually subject to it. The law does what it can on these melancholy occasions to fortify their honesty, by allowing them the most liberal reward. It is, for this reason, the habit of maritime courts not to stint the compensation of salvage service to a naked quantum meruit for the actual labor and danger encountered in the salvage. They act on principles of more enlarged liberality. It is the policy of the law, with a view to the general interest and security of commerce, and to encourage a hardy and adventurous class of men to engage in such laborious and hazardous enterprises, and to take from them the temptation to dishonesty, by the liberality of its reward. But while the law is thus liberal, it requires on the part of the salvors the most scrupulous fidelity. It visits, therefore, any embezzlement, although small, with an entire forfeiture of all claim for salvage. It not only withholds the extraordinary reward awarded to an honest salvor as a premium on his courage and hardihood, but by way of

penalty on his fraud deprives him of even a quantum meruit for his labor. The right having been forfeited, it is not restored by the owner's recovery of the embezzled goods by the aid of a criminal process. There is some reason to believe that a part of the crew of the Albion exhibited some reluctance to become participators in the fraud; and if any of them, before the institution of a compulsory process on behalf of the owners had voluntarily come forward and surrendered that part of the plundered property which they had reluctantly received, I should have felt it my duty to restore them to their rights as salvors. The spirit of the maritime law is to overlook and pardon offences on repentance and the tender of reasonable amends. But without such restitution there can be no pretence of a claim to salvage by those who have made themselves partners in the fraud. This is not contested by the counsel for the libellants, and upon the coming in of the depositions, by an amendment of the libel, the claim of salvage on the part of the master and crew has been withdrawn. But it is contended by the counsel for the respondents, that the master and the whole crew having been concerned in the embezzlement, this works a forfeiture, not only of their shares, but of that of the owners also. The master, it is said, is their agent, and the crew their servants; and the argument is that the owners, upon principles of law, cannot maintain a claim founded on the acts of their agent and servants, when they are so deeply tainted with fraud; that it is against public policy to support a claim under such circumstances. It is at the same time admitted that this will be extending the forfeiture further than it has been carried in any reported decision.

In the case of The Blaireau, 3 Cranch [7 U. S.] 240, and that of The Boston [Case No. 1,673], the master was guilty of embezzlement, and in both cases the forfeiture of his share of the salvage was enforced against him by the court. In the latter case he was part owner, and it was held that the forfeiture extended not only to the share which he claimed on the ground of his personal service, but to the portion to which he would have been entitled as owner. The Boston [supra]. It was not, however, intimated by the court, or contended at the argument, that the fraud of the master could prejudice the claim of the innocent part owners. The objection is admitted to be new, but if it is well founded in law and justice, it ought not to be overruled merely because it has never been taken before. It is true that the master is the agent of the owners, and that they are bound for his acts, as well torts as contracts, while acting within the general scope of his authority. If a vessel is employed as a carrying ship, and the master purloins or embezzles goods taken on freight, the owner will be responsible for his fraud, because to receive and carry goods on freight is within

the general scope of his employment; and as the owners hold him out to the world as a man entitled to confidence, they are held to answer for his frauds to those who trust him. Abb. Shipp. pp. 92, 99, note 1. But the owners are not answerable for his acts, unless they are expressly authorized, or fall within the usual course of his employment. Whether it can be considered as within the scope of the master's authority, when he is intrusted by the owners with a vessel for the purpose of carrying goods on freight, or fishing, or for any of the objects for which vessels are usually employed, to employ it in saving a wreck which he may accidentally fall in with at sea, so that his owners shall be bound for his acts of fraud or negligence, is not, that I am aware of, settled by any reported decision. Though such events are not of very frequent occurrence, it is not rare, when a wreck is met, if the cargo is supposed to be valuable, for an attempt to be made to save it. When the attempt is successful, the owners are not likely to complain. Should, however, their own vessel be lost in the enterprise, it is admitted in all the cases that they would lose their insurance, if the insurance were for the voyage, as it would amount to a deviation and would increase the risk. But if the vessel were insured on time, it is not perhaps quite so clear that the insurance would be forfeited. But whether the master can, in any case, be considered as acting within the scope of his authority, when he employs a vessel in such an unusual enterprise, need not be decided in this case. From the practice of allowing, in such cases, a part of the salvage to the vessel, it would seem that courts do not consider the act as such a violation of duty on the part of the master as would, in case of disaster, render him liable to the owners. But waiving the question as to the power of the master, to involve the responsibility of the owners for his acts, in an affair of this kind, so far as it results from his general authority as master, it is said that the owners, by becoming parties to this libel, have affirmed his act, and that it is now too late for them to deny his authority; and that they are responsible for his frauds precisely as they would be if he had been previously authorized. Admitting it to be so, and the question will be how far this liability extends. If the Albion had been a freighting vessel, and the money and other articles embezzled had been taken on freight, the owners would have been liable only for the value of the articles. When they were restored to the shipper either by the master or any other hand, they would be discharged from their responsibility, and the shipper would be liable for the freight. In the present case the goods embezzled have been restored, and why should not the owners be entitled to a compensation for the use and risk of their vessel in saving them.

It is argued further that it is against public policy to allow the owners to maintain a claim through the acts of their agent and servants, when the transaction which is the foundation of their claim is so deeply tainted with fraud. But in point of fact, the act of the master is not properly the foundation, it is only the occasion of the owner's claim. The master and crew have their own personal claim for their personal services. The foundation of the owner's claim is the service of his vessel. Experience shows that the temptation to fraud is too strong for the integrity of that class of persons who are usually engaged in those enterprises. The law endeavors to overcome this temptation, first by the liberality of its rewards, and secondly by inflicting with unyielding constancy a forfeiture of all salvage upon every person who is guilty of embezzlement. By extending the forfeiture beyond the guilty individual, it is not apparent that more effectual security would be given to property in this exposed situation. If a man would not be deterred from pilfering by the fear of losing his own share of the salvage, there is but little probability that he would be by making his misdemeanor a ground of forfeiture of the rights of others. The operative check on his cupidity is the apprehension of losing his own reward. To extend the forfeiture in this way would be imposing a personal penalty, by way of punishment, where there had been no personal delinquency. It would be inconsistent with the principles of law and justice, and does not appear to me to be called for by any principle of public policy.

A question was raised at the argument, whether the clothing on board, which appears to have been principally the wearing apparel of the crew, ought to be included in the mass of property on which salvage is allowed. I think not. On these melancholy occasions, those who escape from shipwreck usually find themselves in a strange land, without friends and without resources, and if the wreck happens to be brought to the same shore by other hands, the common feelings of humanity require that their clothing should be restored to them forthwith, unburdened with salvage.

Then as to the amount of salvage. In cases of derelict, the habit of the admiralty, it has been said, is to allow a moiety. The rule seems formerly to have been considered imperative, to allow that proportion in all cases, without distinction. But in modern times the rule is not considered as inflexible. Sometimes, though rarely, more is given, and sometimes less, having a just regard to the circumstances of each case; to the risk, the labor, the amount of property saved, and the value of that put at hazard by the salvor's service. The Aquila, 1 C. Rob. Adm. 37; The Fortuna, 4 C. Rob. Adm. 193; Rowe v. The Brig [Case No. 12,093]; The Henry Ewbank [Id. 6,376]. When the property is large in amount, a less proportion is given, and when

the amount of property saved is small, and the merits of the service require it, more than a moiety is given. The principle is to allow such a reward as will be an inducement to men of hardy enterprise, who are familiar with the dangers of the seas, to expose themselves to such risks, and if they are scrupulously faithful in preserving the property for the true owner, to reward them for their honesty. In the present case, although the peril was not great, the weather happening to be unusually favorable, the value of what was saved is small. The cargo of cord-wood is of but little value, and the vessel being brought into a foreign country, and losing her national character, is worth nothing more than the materials which could be obtained by breaking her up. The whole amount is but $536, while that of the salvor vessel, independent of the fish she had on board, is over $2,000. I shall allow three fifths of the gross amount, as salvage. The proportion usually allowed to the vessel is one third, but sometimes a moiety is allowed (The Blenden-Hall, 1 Dod. 421), and I think that not an undue proportion in the present case. The forfeited share of the master and crew accrues to the benefit, not of the co-salvors, to enlarge their shares, but to that of the owners of the property saved.