## Case No. 2,713.

### CHURCH v. SEVENTEEN HUNDRED AND TWELVE DOLLARS.

[4 Adm. Rec. 647.]

District Court, S. D. Florida. June 3, 1853.

SALVAGE—COLLUSIVE SPOLIATION — ARBITRATORS' AGREEMENT TO SHARE COMPENSATION —FORFEITURE OF COMPENSATION—SALVOR'S LIABILITY FOR WRONGFUL ACTS—PROCEEDS.

[1. Neither the salvor nor any person affected by his acts is entitled to compensation for services rendered to a vessel which has been wrecked, pursuant to an agreement between the salvor and the master of the vessel, for the purpose of salvage and division of the compensation allowed therefor.]

[2. The master of a wrecked vessel has no authority, as such, to submit the question of compensation for salvage to arbitration, where he acts in bad faith, and no existing necessity for the submission exists, his duty being to consult the owners, or await a decision in admiralty; and an award made under such circumstances is void as against the owners. The North Carolina, 15 Pet. [40 U. S.] 40, followed.]

[3. Such an award is not even prima facie correct as against the owners, but the burden is on the claimants under it of showing its correctness and validity. The North Carolina, 15 Pet. [40 U. S.] 40, followed.]

[4. Although a settlement by arbitration so made may be void, yet, unless the salvors have forfeited their right by fraud or other misconduct, they are entitled to reasonable salvage, which may be allowed to them in a proceeding in admiralty brought by the owners against the proceeds of the vessel and cargo assigned as salvage. The North Carolina, 15 Pet. [40 U. S.] 40, followed.]

[5. If salvors knowingly permit the master of a wrecked vessel, with or without knowledge of the fact, to consign to one of their number, or a partner, and the parties, by agreement, settle the matter of salvage by arbitration, when a court of admiralty is within easy access, the salvage compensation is forfeited.]

[6. A purchaser, with notice, under an award so made, takes no title.]

[7. An agreement whereby a salvor agrees with the master of a wrecked vessel to give him 10 per cent. of the salvage compensation, while immoral and illegal, may be lawfully performed, but in awarding the salvage the 10 per cent. should be taken into consideration, and the compensation made that much less.]

[8. The fact that a master has voluntarily cast away or destroyed his vessel will not prevent a salvor from recovering compensation, providing he has not aided the master in the criminal design, or concealed knowledge of the transaction.]

[9. A salvor having knowledge of the master's criminal act is bound to make a full statement of the facts within his knowledge to the tribunal deciding the question of salvage.]

[10. An admiralty court has jurisdiction to entertain a libel for "collusive spoliation" by the owners of a vessel wrecked in pursuance of an agreement between the master and a salvor, as against the salvor, and all persons responsible for his acts, in personam, for all the damage occasioned by the wreck.]

[11. Money paid to prevent a sale of property liable to be proceeded against as for salvage services, and not paid over to the claimants, may be treated as proceeds, and proceeded against by the owners of the property, on a libel for "collusive spoilation" in like manner.]

[In admiralty. Libel by Samuel W. Church and others, owners of the bark Empress, against $1,712.32 salvage money in the bark.]

S. I. Douglas, for libellants.
Thomas F. King, for respondent.

MARVIN, District Judge. This is a suit in rem against $1,712.32, being salvage money on the bark Empress and cargo, commenced by Church and others, as owners of the bark. The libel alleges that, in the month of August last, this bark, then under the command of James A. Leet, sailed from Havana, with a cargo of sugar and other merchandise, for Boston, and was afterwards run on to the Florida reef by her master, in pursuance of a previous understanding and agreement entered into in the port of Havana, between him and one Manuel Acosta, claimant in this case, with the intent to make money out of the salvage, and a division between them. That while the bark was aground on the reef several wrecking vessels and men rendered her assistance, and got her off, and brought her into the port of Key West; where the salvors claimed salvage for their services. That among these salvors was Manuel Acosta, master of the smack J. A. Latham, with whom the agreement in Havana is alleged to have been made. That the claim of the salvors to salvage was submitted by them and Captain Leet to the award of arbitrators agreed upon between them; and that the arbitrators awarded salvage; and that, that portion of the salvage, given by the award to Acosta for himself, owners and crew, amounts to the sum of $1,712.32, which is alleged to have been advanced and paid by the owners of the bark, in ignorance of these facts, by their acceptance and payment of Captain Leet's draft upon them, in Boston, for the amount of the salvage and expenses. That the salvage and expenses were advanced by Wm. H. Wall & Co., of Key West, on the captain's drafts, and that this sum of $1,712.32 still remains in their hands unpaid over to Acosta and crew, and ought to be considered as so much money substituted in place of the ship and cargo; and that the award of the arbitrators was void, on account of the fraud and collusion, and conferred no title upon Acosta and crew to the money, and that the sum should be restored to the owners of the bark. The libel then prays a special monition to W. H. Wall & Co., commanding them to bring into court the $1,712.32 or show cause why they should not be required to do so, and that the money may be de-

creed to be paid to the libellants. On the return of the monition, Wall & Co. appeared and filed their answer, stating, in substance, that after the award of the arbitrators in the case of the bark Empress [Case No. 4,476], that the sum of $1,712.32 came to their hands, as the share and earnings of the smack J. A. Latham, owners, master, and crew, and that they still had the same in their possession ready to be paid as the court might direct. The court ordered them to bring in the money and deposit it with the clerk. The money being brought into court, Acosta, as master of the smack J. A. Latham, now appeared and claimed the sum of $1,027.35 for himself and four of the crew; that sum being the aggregate amount of their shares of $1,712.32 awarded to them and the owners of the smack. The owners put in no claim to the balance. Acosta also put in an answer denying the alleged bargain or understanding, and all frauds or collusion.

· The case thus presented by the pleadings is mainly one of facts, and involves an inquiry into the circumstances connected with the stranding or wreck of the bark Empress. Was this bark run ashore, on the Florida reef, voluntarily and in pursuance of an agreement or arrangement entered into between the captain and Acosta, in Havana, to divide the salvage or other moneys between them? The testimony must determine this fact. Captain Fish testifies, in substance, that he was master of the smack Eliza, and Acosta of the smack J. A. Latham. That they were lying together, at the smack wharf in the harbor of Havana, opposite the city. That on his return from the city, one day, some of his men said to him, that a captain of a vessel had been then talking with Acosta, which induced him to inquire of Acosta about it. That Acosta thereupon told him, that there was a want of men and sickness in the crew, and he supposed the bark Empress, Leet, master, was to come ashore on the Florida reef, that she was laden with sugar. Witness told Acosta, if the bark was to be wrecked, he wanted a chance. Acosta agreed to this. In the same conversation, Acosta further told him that he was acquainted with the master, Captain Leet; had seen him in Key West, and that the agreement was. that the bark was to run ashore, on the Florida reef, and that he (Acosta) was to wreck the bark and give the captain $1,500. He is positive that Acosta mentioned to him, the name of Captain Leet and the bark Empress. He supposed the bark would sail a few days after the smacks. Witness did not see the bark or Captain Leet in Havana. There were plenty of men there. Witness and Acosta left Havana together, in their respective smacks, and arrived at Key West. Acosta remained at Key West one day, and the next day left in his smack. Witness did not go to the wreck. Captain Geiger testifies, in substance, that the day after Acosta arrived in

Key West from Havana, he asked the witness if he would consort? The witness asked why? Acosta answered that there was two or three vessels in Havana short of crews, and he believed that one of them would get ashore on the Florida reef; that the captains had said they were coming over here for crews; and that there was a bark there laden with sugar, cigars, cochineal or indigo. Witness consorted his vessel and men with Acosta's, "vessel for vessel and man for man, for four or five days." The second day after Acosta arrived from Havana, he and witness left Key West, in their respective vessels, on a cruise together, to go as far as Knight's Key. The witness anchored for the night, at Sall Bunches, about fifteen miles from Key West. Acosta passed him, and went on to the windward. The next day he saw a sloop coming down from the windward loaded with cargo. He proceeded up the coast to where the bark had been ashore. She had been got off before he arrived, and was in the charge of Temple Pent. Acosta was there. He told witness that this was the bark that was to come over to Key West to get a crew. In the conversation at Key West, Acosta told him that he believed the bark would. run ashore, not that she was to run ashore. Acosta further told him, that he had had a conversation with the captain of the bark, on board his smack in Havana, and that the captain said if he did run ashore, he would consign to a big man who, Acosta thought, was the witness. The consignment was not made to witness, nor did he get any of the salvage.

Temple Pent testifies, that when he boarded the bark Empress, she was hard and fast aground. He offered his assistance to Captain Leet, who said: "I want to make some money as well as you. How much will you give me for the privilege of wrecking?" Pent answered that he would give him 8 per cent. on the salvage that might be awarded him. The captain replied that that was not enough. Witness then said that he would give him ten per cent., which he agreed to. They then went to work, and loaded the Hawkins, and the Lavinia, and while loading the Joseph Alexander, the smack J. A. Latham, Acosta, master, arrived and was taken in as a co-salvor. After loading these vessels, the bark was got off and brought to Key West, and upon the payment of the salvage, the witness paid Captain Leet the 10 per cent., according to agreement.

It does not appear in this case what sum was awarded by the arbitrators, for the entire salvage, but it is admitted that an award was made, and that the share awarded to the smack J. A. Latham is $1,712.32, which remained in the hands of Wm. H. Wall & Co.—they having advanced the whole salvage on the captain's drafts upon the owners—which sum, not having been paid over to Acosta and crew, is the sum now brought into court, $1,027.35 of which is claimed by

Acosta and crew, as salvors, under the award; the balance, being the share of the owners of the smack, is not claimed by them. The testimony fully proves the fact that this bark was voluntarily run aground, on the Florida reef by her master, in pursuance of an agreement or understanding, had with Manuel Acosta, the claimant in this case, in Havana, to divide the salvage or other charges upon the property between them. This fact being established, the case is decided. Neither Acosta, nor any person affected by his acts, could earn or acquire any right to salvage, for any services rendered to a vessel under such circumstances. Consequently, this money belongs to the owners of the bark, and must be decreed to them.

One point, however, arises in this case, which, although not very much relied upon by Acosta's counsel, is nevertheless entitled to some consideration, and cannot, with propriety, be wholly overlooked by the court. The point is, that Acosta and crew are entitled to this money under the award of the arbitrators. There is no testimony before me as to who the arbitrators were, or what was the character of the proceedings before them. It is stated, that they were selected by the master of the bark and the salvors, and it is presumed that they were respectable and competent men, and made up their award according to their best judgment upon the facts as presented to them. The question is what authority, if any, had the master, under the circumstances, to submit this question of salvage to the arbitrament of arbitrators; and what effect or validity has the award made by them? The general duty of the master is to navigate his ship, and carry his cargo to its port of destination; and as a general rule his powers are equal to, and commensurate with, his duties. If he is compelled by stress of weather, or injuries to his ship, to put into an intermediate port; or if his ship strike upon the rocks, and is saved, or the ship be lost and the cargo saved, in all these and other cases of unforeseen accident and misfortune, his powers are commensurate with his duties and adequate to the emergency. But they do not go beyond. His duty is to do the best he can, in honest good faith, to protect, save and preserve the property committed to his care. In cases of necessity, he may borrow money on bottomry, or sell a part, or even the whole, of the property, but his authority to do so is founded on urgent necessity and good faith, to be judged of, afterwards, by the tribunals of the law. If he borrow or sell without justifiable necessity, or in bad faith, his acts are void, and the lender or purchaser will take no title. In these cases, which arise out of the ordinary line of his duty, necessity,—a real and certain necessity, not a fancied one,—and good faith on his part, seem to furnish the rule by which to determine the extent of his power. Applying these general rules to the present question,

and there is no difficulty in deciding it. There was neither good faith on the part of the master, nor any necessity under the circumstances, to authorize him to submit this question of salvage to arbitration.

But the subject of the authority of the master to submit a question of salvage to arbitration has been considered by the supreme court of the United States in the case of Houseman v. The North Carolina, 15 Pet. [40 U. S.] 40. The case was this: The schooner North Carolina, laden with cotton, got ashore in the night on Pickle's reef, and was lightened by the schooner Hyder Ali, got off by removing 110 bales of cotton, and carried into Indian Key, where, by the agreement of the master and salvors, the question of salvage was submitted to Otis and Johnson, who awarded 35 per cent. upon the value of the vessel and cargo for salvage, and 122 bales of cotton were assigned in payment of the salvage on the cargo. The consignees residing in Charleston disapproved the master's acts, and caused a suit in admiralty, in the superior court of this district, to be instituted against the cotton taken in payment of salvage. Houseman appeared and claimed the cotton, as purchaser, under the award. The supreme court decided: First. That the master had no authority to bind his owners by the settlement at Indian Key. Second. That the settlement was fraudulently made. Third. That the salvors by their conduct, had forfeited all claims to compensation even for the services actually rendered. Fourth. That the owners were entitled to recover their cotton, or the value thereof.

In arriving at this conclusion the court says, that "there may be cases in which the contract of the captain in relation to the amount of salvage to be paid to the salvors, or his agreement to refer the question to arbitrators, would bind the owners. In times of disaster it is always his duty to exercise his best judgment, and to use his best exertions for the benefit of the owners of both vessel and cargo, and when, from his situation, he is unable to consult them, or their agent, without an inconvenient and injurious delay, it is in his power to compromise a question of salvage; and he is not bound in all cases to wait for the decision of a court of admiralty; so, too, when the salvage service has not been important, and the compensation demanded is a small one, the master may settle in order to proceed on his voyage." These remarks imply, that in addition to the master's exercising his best judgment, and using his best exertions, in times of disaster, that it is also his duty to consult the owners of the vessel and cargo whenever he can do so without injurious delay. They imply, also, that in some cases he is bound to wait for the decision of a court of admiralty, and not undertake himself to settle the question of salvage or to refer it to arbitrators. The court further say "that in all such cases

of settlement of salvage, unless the acts of the master are ratified by the owners, his conduct will be carefully watched and scrutinized by the court, and his contracts will not be regarded as binding upon the parties concerned, unless they appear to have been bona fide, and such as a discreet owner placed in the like circumstances would probably have made. If he settles the amount by agreement, those who claim under it must show that the salvage allowed was reasonable and just. If he refers it to arbitrators, those who claim the benefit of the award must show that the proceedings were fair, and the referees worthy of the trust. These remarks imply that even in cases where, from the smallness of the demand, or the difficulties of consulting the owners, or other circumstances, the captain is supposed to have authority to settle a question of salvage or to refer it, yet, still, such settlement or award will not be deemed to be even prima facie correct or valid, but those who claim under it must show its correctness and validity by proving the settlement to be just and reasonable, or the award fair and the referees worthy of the trust.

The facts relied upon by the court to show that the captain of the North Carolina had no authority to bind the owners are: First. That the salvage demanded was exorbitant. It was 35 per cent. Second. That he could in a very few days, have communicated with the owners at Charleston or Apalachicola. Third. No reason is assigned for this hurried and extraordinary settlement. Fourth. It was his duty to have brought the subject before the proper tribunal, at the same time advising the owners or consignees, of what had happened, in order that they might have an opportunity of attending to their own interest. The facts relied upon to show that the settlement by arbitration was fraudulently made are: First, and principally. That Houseman became, at Indian Key, the consignee of the vessel and cargo, and took upon himself, to represent the interest of the owners, when he himself was a partner with the salvors, and had a direct interest in pushing the salvage to the highest possible amount. Second. That the captain did not appear to know anything about the arbitrators, but their situation obviously placed all their feelings and partialities on the side of the salvors. If Houseman selected the arbitrators for the captain, then both arbitrators were in fact selected by the salvors. It does not appear, in the present case, whether the consignee of the Empress, in this place, was, like Houseman, a partner with the salvors, or interested in the salvage. If so it would be difficult to distinguish this case, in this particular, from that of The North Carolina. The supreme court evidently considered, in such cases, the duty of a consignee and the interest of a salvor to be in opposition and incompatible with each other. Although a settlement by agreement or by arbitration may be void on

account of a want of authority in the master to make it, or on account of his bad faith, or of the salvage being unreasonable, yet, in proceeding in a court of admiralty, by the owners against the property assigned for salvage, as in the case of The North Carolina [supra], or against its proceeds, as in the present case, the salvors are entitled to have allowed them a reasonable salvage, unless they have forfeited their right by fraud or other misconduct. The Sarah Ann [Case No. 12,342]; The Perseverance, 2 C. Rob. Adm. 239; The Nostra Conceicas, 5 C. Rob. Adm. 294. The supreme court adjudged the salvage to be forfeited in the case of The North Carolina for fraud and misconduct. Let us see if we can learn in what that misconduct consisted. It is not expressly and in few words stated in the opinion, but it may be gathered from the opinion that their misconduct consisted in taking the schooner into Indian Key and there making a demand of what the court thought an exorbitant salvage and permitting and assenting to the settlement by arbitration, under the advice of Houseman, acting as the master's consignee, he being, at the time, "their partner and interested in pushing the salvage to the highest possible amount." The court says "the evidence does not show whether the master was apprised of Houseman's connection with the salvors." And if he were ignorant of that connection, then, the salvors permitted him to act under a false impression when it was their duty to undeceive him. But the court says "the master's conduct leads strongly to the conclusion that he was not deceived, and that he knowingly betrayed the interest of his owners." If so, the salvors knowingly aided him in that betrayal.

The law of salvage, like all laws formed in reason, is tolerant of the frailties and imperfections of men. It often overlooks their errors of judgment, and mistake of ignorance, and pardons much in their conduct which may be attributed to a keen sense of interest, provided their conduct does not go beyond the bounds of common honesty and fair dealing. But there are principles of right and wrong, of honesty and dishonesty, of truth and falsehood, founded in the law of nature, known to all men, and recognized in the laws of all societies without a general observance of which no society can long exist. The great fundamental laws every court must enforce. The law cannot, therefore, tolerate in salvors dishonesty, corruption, fraud, falsehood, either in rendering the service, or in their proceedings to recover the salvage. If, therefore, salvors knowingly permit the master of a wrecked vessel to consign to one of their number, or a partner, and do not inform him of that connection, or he, knowing that connection, nevertheless, does make such consignment, and they afterwards go on to settle by agreement or arbitration the matter of salvage, when there is a tribunal, established by the government within reach, clothed with

authority to make such settlement and protect the rights of all parties, and which holds the legal standard by which to measure the value of their services, there is no escaping in my judgment from the conclusion, that their salvage, under the authority of the decision made by the supreme court, may be justly and legally forfeited, and purchasers under the award, with notice, will take no title. The settlement being at Indian Key, and the fitness of the arbitrators not shown, are circumstances noticed by the court, but not as important in themselves, for had the settlement been, in other respects, honest and legal, the place of the settlement would not have made it illegal. By applying the principles of the decision of the supreme court to the present case, there is no difficulty in deciding the award of the arbitrators to be void. See, also, the case of The Britain, 1 W. Rob. Adm. (N. S.) 40, on the subject of the authority of the master of the saving vessel to bind his crew by submission to arbitration.

There is another feature in the history of this case disclosed by the proof to which I feel bound to advert. Temple Pent, not Acosta, was the first person to board the Empress when she lay upon the reef. He was met by Captain Leet with the declamation, "I want to make some money as well as you. How much will you give me for the privilege of wrecking?" This was really a proposal, on the part of Captain Leet, that the two should take the property of other people, without any right, but under color of salvage, and apply it to his own use; that Pent should aid him to appropriate to himself a portion of the cargo. Pent agreed to give him, and did give, 10 per cent. on the salvage. The immorality and illegality of this transaction is too plain for argument or comment. Pent's duty was, not to listen to the captain's proposal, but to reject it at once. Let the property be lost, if a captain will not permit it to be saved without the salvor's consenting to bribe and corrupt him, and that, too, with money belonging to neither of them. The making of such agreement is immoral and unlawful, but when made, it may be lawfully performed, if salvage be allowed, by taking the sum agreed to be given the captain into consideration in fixing the amount of salvage, and making the salvage so much less. In this manner, the agreement may be performed to the owner of the property, who, if anybody, is entitled to the benefit of it, and not the captain.

In the case of The James,[1] the court of appeals of Florida decided. in 1839, that an agreement to give the master of the ship a portion of the salvage was unlawful and immoral, and worked a forfeiture of the salvage. And the court forfeited the salvage of vessels and men in that case, on account of such agreement. The principle of law is that the master cannot, in any manner, directly or indirectly, lawfully make any money out of the wreck of his own vessel, or out of any business growing out of the wreck; and any agreement or arrangement enabling him to do so is deemed, in law, fraudulent and corrupt. Masters sometimes voluntarily cast their vessels ashore on this coast, and bore holes in them, or burn or otherwise destroy them without any previous communication or collusion with any of the wreckers. When this is the case, the wreckers, by saving the property, entitle themselves to salvage, provided they do not forfeit it by aiding the master in his criminal design; and do not conceal their knowledge of the transaction. But they are bound to make a full statement of the facts to the tribunal that decides upon the question of salvage, and to give evidence of the facts within their knowledge in order to a conviction of the master. Concealment in such cases is a participation in the crime.

One further point remains in the case, that of the jurisdiction of the court. Ships and their cargoes, crews, and passengers, in a voyage, upon the high seas, are governed and protected by the maritime law, which law is administered, appropriately, but not exclusively, in the admiralty courts. Assaults, beatings, imprisonments, collisions, pillage, unlawful seizures or restraints, spoliations and depredations upon property, tortious or collusive wrecks, unlawful deviations and negligences, and other wrongs, committed or happening upon the high seas, are within the jurisdiction of these courts. The jurisdiction in the present case is, I conceive, founded in a marine tort which consisted in the tortious wreck of the Empress, to which Acosta was a party, by his previous bargain, and by being present and aiding in the main design, and seeking to derive advantage from it. The act may be termed, in the language of the maritime law, collusive spoliation; and Acosta, and all persons responsible for his acts. may be sued, in admiralty, in personam for all the damage occasioned by the wreck. The libel does not seem to be drawn with reference to this idea of the foundation of the jurisdiction, but still it states the facts in such a manner as to enable the court to take jurisdiction and decree upon them.

The jurisdiction, in the present case, may be considered in another point of view. If goods be wrongfully taken at sea and brought to the land or if rightfully taken at sea, as by salvors, and afterwards wrongfully withheld, they may be seized in admiralty, and restored to the rightful owner. Bacon's Abr. tit. "Admiralty," B.; [Houseman v. The North Carolina], 15 Pet. [40 U. S.] 48. The libel seeks this remedy and is in rem against $1,712.32, which, it alleges, stands in place of so much cargo as the money represents; the cargo having been wrongfully taken at sea, and wrongfully withheld on land, under a pretended claim of salvage, and the money having been paid or placed

in lieu thereof. Were this money a deposit in court, as a security for salvage, it would be restored; or were it the proceeds of an actual sale of cargo, it clearly might be proceeded against (Willis v. Commissioners of Appeals in Prize Causes, 5 East. 23); or, were it cargo itself, the case would be the same in principle as Houseman v. The North Carolina, 15 Pet. [40 U. S.] 48, and Peisth v. Ware, 4 Cranch [8 U. S.] 347. But as it is neither cargo nor proceeds of an actual sale, it is agreed that the suit is really for money paid and advanced, or had and received, over which it is conceded that the admiralty has no jurisdiction. But the whole subject matter of the dispute being a marine tort. and a pretended claim of salvage, as to which the court has a clear and peculiar jurisdiction, the objection here raised goes not so much to the court, as to the form of the remedy, i. e. whether the suit should be in personam or in rem. And I think it would be refining too much to say that money paid to prevent a sale of property liable to be proceeded against may not be treated as proceeds of that property and be proceeded against in like manner, when that money has not been paid over to the claimants. but remains in the hands of a third person. 5 East. 32; Sheppard v. Taylor, 5 Pet. [30 U. S.] 675; Brown v. Lull [Case No. 2,018]. For the purposes of the trial Acosta has admitted the libellants, Church and others, to have been the owners of the bark; but proof of their ownership, at the time of the disaster, must be made to authorize the decreeing of the money to them. Upon such proof being made, the money will be decreed to them, or their authorized agent. and Acosta condemned in costs. U. S. v. La Jeune Eugenie [Case No. 15.551].

[NOTE. For the determination of a subsequent suit by one of the owners of the cargo to recover moneys paid by him for salvage compensation and other expenses, see Shelton v. Church, Case No. 2,714. next following.]