Gilberto JIMENEZ, Plaintiff-Appellee,

v.

The TUNA VESSEL "GRANADA," her engines, boilers, tackle, etc., Defendant-Appellant.

No. 80–5748
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.
Unit A

July 20, 1981.

Lillick, McHose & Charles, Robert G. Dyer, San Diego, Cal., Woodrow De Castro, Panama City, Republic of Panama, for defendant-appellant.

David J. Kiyonaga, Balboa, Republic of Panama, for plaintiff-appellee.

Before GEE, RUBIN and RANDALL, Circuit Judges.

GEE, Circuit Judge:

Strict enforcement of a pretrial order, combined with decision of the issue of unseaworthiness on unpleaded grounds, denied procedural due process to the appellant in this case. Though it comes on in the twilight of our jurisdiction over the Canal Zone, we must reverse and remand for further proceedings.

Plaintiff Jimenez filed this action in rem on the admiralty side demanding recovery for back injuries claimed to have been sustained on the T/V GRANADA, a tuna boat. His pleadings generally alleged unseaworthiness, but his stated sole theory of recovery, set out in the court's pretrial order of December 19, 1979, and reiterated in

his proposed findings of fact filed on May 6, 1980,[1] was:

> On or about August, 1976, the T/V "GRANADA" was engaging in fishing operations in the Pacific Ocean off the coast of Mexico. The vessel was bringing in the fishing net through a powerblock controlled by the navigator. The net would go through the powerblock above and descend on the deck in two "bunches", one a net pile and the other a cork pile. The plaintiff was standing on top of the cork pile and separated the corks from the net as the net descended. The cork pile would become higher as the operation progressed. Some 20–30 minutes into the operation, the weather became rough with 15–20 knot winds and white caps. The vessel began rocking. The navigator has been erratically and repeatedly reversing the powerblock throughout the operation; this was his pattern of working the powerblock in order not to slow the operation. The navigator engaged this custom when he boarded the T/V "GRANADA" in December, 1975, and continued the custom during the voyage the plaintiff was injured and thereafter. About 40 minutes into the operation and as the plaintiff was standing on the cork pile that was now approximately ten feet high, the plaintiff's hand became entangled in the net as the vessel rocked and his balance and stability were impaired.[2] While the plaintiff's hand was entangled, the navigator suddenly reversed the net pulling the net upward, and the plaintiff was lifted into the air. The plaintiff and other seamen yelled warnings to the navigator. Instead of slowly lowering the net and the plaintiff in a safe manner, the navigator rapidly dropped the net by again reversing the powerblock, causing the plaintiff to suddenly fall down approximately 10 feet where he struck the bulwark of the vessel then flipped over into the sea in a[n] unconscious state. Shortly after the incident, the plaintiff began experiencing pain and discomfort in his lower back and neck.

In January, following the entry of the pretrial order, the defendant filed a list of witnesses to be called by it, as required by the court's pretrial notice. That notice specified that witnesses could be added to the order up to but not after ten full work days before trial, exempting "rebuttal witnesses whose necessity cannot be reasonably anticipated."[3] In the interim between the entry of the pretrial order and trial on May 7, both parties took depositions, recognizing that many of the witnesses—tuna fishermen often absent for months on fishing voyages—might not be available to testify at trial. Among those deposed was one Marquez, a fisherman who had been assisting plaintiff Jimenez with the recovery of the large tuna net at the time of his injury. Marquez, an all but embarrassingly enthusiastic witness in Mr. Jimenez' behalf, supported his version of the accident, quoted above, in toto. In his deposition, taken about five weeks before trial, Marquez enlarged on the navigator's faulty performance in reversing the winch powerblock, described the weather at the time of the injury as "very, very bad," and linked the resulting rough seas to the plaintiff's version of the accident and theory of recovery quoted above:

> Q. Now, can you tell us what you saw when the accident occurred, what happened.
>
> A. At a given moment when the net was rolling aboard all of a sudden I saw that the net went to the other side. I released the net and I looked at the man because he went up a little because he was holding on to the net. All of a sudden the net came back to its position inside but

---

1. Trial began on May 7, 1980.

2. Because of its significance to our view of the case, we call attention here to this reference, in the issue as thus framed by plaintiff's counsel on the eve of trial, to the rocking of the vessel and its effect to impair plaintiff's balance and stability.

3. An attempt by defendant to add further witnesses six days before trial was denied as untimely.

the man was no longer there. In other words, the navigator is in charge of the control of putting the net up aboard. He made a mistake and he rolled it to the other side making this man—causing to lift this man up and *since it was rough he lost his balance and went out.*

. . . .

MR. CARRIEDO: Dennis, I know you are getting excited. Please try to slow down a little bit.

MR. DYER: It is very hard for the interpreter to keep up with you when you speak very fast and he has a hard time writing everything down too. Let's all try to talk slower.

THE WITNESS: I am sorry. It is just that I remember a lot of accidents I have seen and unfortunately with the same captain and—

MR. DYER: I move to strike all that.

BY MR. DYER:

Q. Now, was there anything wrong with the power block? Did the power block function properly at the time of the accident?

A. The power block was normal.

Q. So you are saying the only cause of the accident was the navigator's mistake?

A. Yes, *accompanied with the bad weather because possibly maybe the mistake of the navigator wouldn't have been so big if the weather hadn't been so bad,* but the main— the main cause of that man's accident was the mistake of the navigator. It is not an opinion, it is an honest opinion of my high capacity. I can show you papers of a technical in fishing and I can speak in court as an authority, that was a mistake on the navigation because we all yelled and yelled, "Stop it, stop it," but he didn't stop it. *That's more proof that he was not paying attention to his job.*

At trial the plaintiff testified in full accord with his theory of liability, as set out in the pretrial order and proposed findings of fact: that his injury was caused solely by catching his hand in the net when the navigator reversed the power block pulling it in, snatching him high in the air and then dropping him precipitately. He specifically denied merely slipping off of the piled net and cork floats and testified explicitly that only catching his hand in the net caused his fall, adding:

Q. Now, Mr. Jimenez, going back just for a second to the time of your accident, did the wind have anything to do with your catching your finger in the net?

A. The wind, no. The one that was at fault was Vitto Alioto, the navigator.

Q. So the only reason your finger got caught in the net was because the navigator reversed the power block; is that right?

A. Yes, sir.

Other witnesses testified on the weather issue, some that the conditions were not severe, that other boats were fishing the area at the time, and that boats routinely fished in worse. There was also testimony that retrieving the nets, with their round cork floats, was a slippery business, with falls onto the piled nets or deck common. The master, the powerblock operator, and others testified by deposition that the plaintiff merely slipped and fell overboard, flatly denying his winch-reversal testimony. Marquez' deposition, supporting it and linking it with the weather conditions, was received in full. Among the evidence received was a short film, offered by defendant, showing net recovery under optimal weather conditions, with several slips and falls among the net-recovery crew even so. At no time was the theory on which plaintiff based his claim of unseaworthiness, stated in the pretrial order, amended, nor was leave sought to do so. At the conclusion of the plaintiff's case, defendant sought to offer live witnesses, but this was denied it.

In sum, a careful reading of the record makes clear that the case was tried on whether plaintiff's powerblock reversal/un-

seaworthiness version of the incident was the true one or whether, as defendant contended, plaintiff merely slipped on the retrieving nets and floats and fell overboard. Essentially, plaintiff sought to establish his version of the fall, while defendant sought to show that it took place in some other way.

Two days following the close of the evidence, the trial judge filed a minute entry, "Reasons for Judgment," in which he entirely rejected the plaintiff's version of the accident. Despite this rejection, however, he found the GRANADA unseaworthy on grounds neither pleaded by Jimenez nor set out in the pretrial order and awarded substantial damages. Pertinent portions of his order follow:

## FINDINGS OF FACT

. . . .

### -6-

JOHN FREITAS GOIS, the master of the vessel and fish captain, was a seaman of twenty-four years' tuna fishing experience who himself had served as a cork man for four and a half years. The captain finds the job of cork man hazardous and further testified that it is common for one assigned the task to "slip, lose his balance, or fall, because the corks are round with a hole in the center and a line through it. The cork will spin around this line many times so, in reality, it's rolling under your feet like a pair of skates in some instances." Captain GOIS saw men, including himself, fall while engaged in this duty "hundreds of times." The difficulty of the cork stacking operation on a vessel tied to a dock is graphically illustrated in the motion picture film exhibited by Defendant and it can be plainly seen that men are required to work on an unstable surface substantial heights above the deck of the vessel.

### -7-

At the time of the accident, the weather was "sloppy," the winds were in excess of 15 miles per hour, and there were white caps on the seas.

. . . .

### -9-

JIMINEZ testified that while stacking the corks, his finger became entangled in the net, that ALIOTO reversed the power block, and that he was raised above the cork stack and then dropped back upon the pile. He testified that when he fell, he lost his footing and fell from the pile onto the bulwark and into the water. On the other hand, both ALIOTO and Captain GOIS denied that JIMENEZ became entangled in the net and was dropped by the power block.

### -10-

I find that while working atop the cork pile in a rough sea, JIMENEZ lost his footing on the wet rolling cork, fell and struck his back on the bulwark, and then fell into the sea.

### -11-

There was no stable surface provided from which one engaged in this hazardous duty could work, no safety equipment provided for men working on the cork pile, and there was insufficient guardrail to prevent one working on the cork stack from falling into the sea if he were to slip and fall.

### -12-

The failure to provide or require use of safety equipment, to provide adequate guardrail, or a stable surface upon which to work rendered the T/V "GRANADA" unseaworthy and was the cause of the injury to Plaintiff.

. . . .

## CONCLUSIONS OF LAW

. . . .

### -3-

The T/V "GRANADA" is unseaworthy in the following particulars, each of

which was a proximate cause of Plaintiff's injury: (a) the procedure for stacking corks or floats required that Plaintiff stand on wet corks that turned freely as though he was on roller skates and created an unstable surface from which he was required to perform his work; (b) there was no safety equipment for Plaintiff to use to secure his person from falling from the cork stack, which was known to have fallen "hundreds of times"; (c) the guardrails were inadequate to protect men from falling into the sea while working above the deck on the cork stack; (d) the area provided for stacking of corks was too close to the guardrail; and (e) the failure to suspend the net retrieval operation during high wind and rough seas.

In ruling on defendant's motion for new trial, the court reviewed the evidence supporting his findings of unseaworthiness and observed, as to the procedural context in which they were made:

Defendant next complains that the vessel was found unseaworthy on a "Liability Theory Not Advanced By Either Of The Parties And Defendant Had No Opportunity To Present Evidence On The Issue." In his complaint, plaintiff alleged that he sustained his injury "solely by the unsafe and unseaworthy condition of the vessel and its appurtenances, as will be more fully brought out at the trial of this action." In the pre-trial order plaintiff claimed that he was pulled into the air when he became caught in the fish net being brought aboard the vessel, and then, instead of the net being slowly lowered, it was immediately reversed causing him to fall a distance of 10 feet, strike the bulwark and fall into the sea. The "unseaworthiness of the vessel and its appurtenances" was listed as a contested issue of fact.

The evidence of unseaworthiness was overwhelming. While stacking the cork floats of the tuna fishing net, Jimenez lost his footing and fell from the cork stack, hit his back on the bulwark and landed in the sea. The weather was "sloppy" at the time of the accident.

Winds were in excess of 15 miles per hour and there were white caps on the seas. Jimenez was the "cork man," and his duties required that he stack the cork floats attached to the net in large semi-circles 5 or 6 feet above the deck on the stern of the vessel against the guard rail. The corks are round, 6 or 7 inches in diameter, and the cork line passes through them allowing the cork to rotate freely. In order to stack the corks it was necessary for Jimenez to stand on top of the corks above the height of the guardrail while the vessel moved through the choppy sea. There was no harness, net or other safety equipment; there was no stable surface on which he could stand provided to plaintiff; and the guard rail was too low to prevent him from falling into the sea.

Defendant's failure to prepare to defend on such an obvious danger is no reason for a new trial for it was the testimony of defendant's witnesses and an exhibit offered by him that provided a solid and graphic basis for my finding.

. . . .

Preparation of pre-trial orders and attendance at pre-trial conferences is new to the Bar of the District of the Canal Zone, and the art of formulation of pre-trial orders has not yet been perfected. Termination of the court's jurisdiction by the Panama Canal Treaty of 1977 and the requirements that pending civil cases be completed within 30 months after the October 1, 1979 entry in the force of the treaty made it necessary that an orderly procedure be established for disposition of the court's more than 700 civil cases. In furtherance of that objective, pre-trial procedures were instituted in the district and enforced. Because the procedure was new and the lawyers had little or no experience with preparation of pre-trial orders, it became more important than usual to require trial counsel to attend pre-trial conferences to discuss matters which inexperience caused to be omitted from pre-trial orders. Such is the requirement of the pre-trial notice of the

District of the Canal Zone. Nevertheless, counsel for defendant, Robert G. Dyer, Esq., who filed this motion for new trial and who appeared for defendant as trial counsel did not attend the pre-trial conference. Mr. Dyer is not a member of the bar of the district and did not appear in the district until the week of trial. Had Mr. Dyer attended the pre-trial conference, he would have known that *the contested issue of unseaworthiness was fully discussed and aired at the pre-trial conference and the discussions were consistent with the proof and my findings.* (Emphasis added; footnotes omitted).

Other than the court's very general observation emphasized above, we can find no indication in the record that the defendant received any notice, or should clearly have realized, that the case was to be tried on theories of unseaworthiness not specified in the pretrial order.

As Professor Wright notes, the free amendment features of Rule 15, Federal Rules of Civil Procedure, are designed to facilitate decision of claims on their merits rather than on procedural technicalities.[4] One of the rule's more salutary features is found in the opening sentence of its subparagraph (b): "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." So we avoid a parsing of the pleadings by the losing party in hopes that some issue, patently tried out with the knowledge of all, was not raised in them. The coin has another side, however; each party is entitled to know what is being tried, or at least to the means to find out. Notice remains a first-reader element of procedural due process, and trial by ambush is no more favored here than elsewhere.

Turning to the matter in hand, we note that the district court's pretrial notice, aptly subtitled "Read or Regret," directs that the pretrial order shall contain:

[P]articularities concerning the following fact issues . . . :

a. Whenever there is in issue the seaworthiness of a vessel or her equipment or appliances, or an unsafe condition of property, the material facts and circumstances relied upon to establish the claimed unseaworthy or unsafe condition shall be specified with particularity . . . .

This the pretrial order did, clearly setting out one theory of unseaworthiness only: the actions of the navigator in twice reversing the direction of the powerblock, first lifting plaintiff into the air by his enmeshed hand and next dropping him ten feet onto the vessel's bulwark, from which he bounced into the sea. No suggestion whatever is to be found in the order that the condition or nature of the net and cork pile itself, or that of the weather, were claimed to amount to unseaworthiness.

After entry of the order, depositions were taken, including that of Mr. Marquez, partially quoted above, who linked bad weather to plaintiff's version of the accident, based on the navigator's mistake. Perhaps owing to this, plaintiff's proposed finding of fact on liability—his sole one—filed on the eve of trial and given defendant on the day, added a reference to the rocking of the vessel and stability, as bearing on the entanglement of his hand.[5] Trial followed, with introduction of evidence on weather conditions and on the instability of net and floats as customarily piled on the deck during retrieval. As noted above, the trial court rejected Mr. Jimenez' version of the accident entirely but found the vessel unseaworthy for continuing retrieval operations, given the weather conditions, and for various customary features of the net retrieval operation itself. No motion to amend the pleadings or pretrial order was ever made, nor does the record reveal any

---

4. Wright & Miller, *Federal Practice and Procedure: Civil* § 1471. As an illustration of the common law's abhorrence of both amendments and variances, he cites the appeal in *Spangler v. Pugh*, 21 Ill. 85 (1859), in which judgment for

plaintiff was reversed where he had alleged an obligation of $2,579.57 but proved a half-penny more.

5. Quoted above at p. 416.

other indication to the defendant from any source that a finding of unseaworthiness might be predicated on such grounds. Hence, if they are to stand as a foundation for the judgment, it must be on the basis of an implied consent to try unpleaded issues.

■ Express consent to try such issues rarely presents problems; implied consent, however, is much more difficult to establish since it depends on whether the parties recognized that an issue not presented by the pleadings entered the case at trial.[6] Where a party does not recognize the significance of evidence and so fails to contest it, he cannot realistically be said to have given his implied consent to the trial of unpled issues suggested by it, always assuming that his failure to grasp its significance was reasonable.[7] A prime example of such a circumstances occurs when evidence is introduced that is relevant to an issue already in the case and there is no indication that the party who introduced the evidence was seeking to raise a new issue.[8] We have often so held. *International Harvester Credit v. East Coast Truck*, 547 F.2d 888, 890 (5th Cir.1977); *Bettes v. Stonewall Insurance Co.*, 480 F.2d 92, 94–95 (5th Cir. 1973). Such was the case here.

■ All of the evidence upon which the court relied in finding the GRANADA unseaworthy on unpled grounds was relevant in one degree or another to the issue made in the pleadings, set out in the pretrial order, and elaborated slightly in plaintiff's proposed finding of fact. Plaintiff's theory of liability was that mistaken procedures by the powerblock operator caused the accident, defendant's—likewise indicated in the pretrial order—was that while stacking the

nets and their attached corks during the retrieval process plaintiff simply lost his balance and fell overboard. To show the customary manner of that process, and the particular circumstances of it on the day of the accident, was certainly relevant to the pleaded issues noted in the order. Weather conditions as well had been linked by plaintiff to his theory of the case. We conclude that the introduction of such evidence gave this defendant no fair notice that new issues were thereby entering the case, issues that it must meet or suffer an adverse judgment. Nor did the court give defendant any indication that it contemplated a disposition on such grounds; instead, it denied it permission to present any live witnesses in its defense on grounds that their names were tardily furnished. If, in the court's view, new issues had been raised at trial, this ruling is difficult to understand, since the pretrial notice exempts from the listing requirement "rebuttal witnesses whose necessity cannot be reasonably anticipated." We are unable to avoid the conclusion that in the circumstances the court abused its discretion in determining that the unpled issues on which it decided against the GRANADA were tried by its implied consent.[9]

In closing, we express our sympathy with the situation of the trial court, faced as it was with many hundreds of cases to dispose of within a time frame dictated by foreign policy considerations and neither of its choosing nor within its control. Nor was the manner in which counsel conducted trial preparations impeccable; a degree of impatience, even exasperation, on the part of the judge is understandable. Nor do we now hold that the grounds upon which the court

---

6. Wright, *supra*, at § 1493, p. 462.

7. *Id.* at 468–69.

8. *Id.* at 466.

9. In this connection, we in no wise discount the court's observation, in its order denying new trial (ms. op. 7), that the issues on which it based its judgment were aired at the pretrial conference, which trial counsel for defendant did not attend. That conference is not reported in the record, however, and neither the pretrial order nor the proposed finding of fact prepared

by plaintiff's counsel months thereafter advance these issues as discrete grounds for liability. In these circumstances, we cannot review the degree to which they were aired. Evidently plaintiff's counsel either did not grasp their significance or, if he did, cast them aside in the course of his trial preparations. Thus defendant's trial counsel, even had he been present, would have been justified in concluding that they had been abandoned as independent grounds of unseaworthiness.

rested its judgment were necessarily erroneous, a question that we need not and do not reach. We hold only that trial of unpled issues by implied consent is not lightly to be inferred under Rule 15(b), that such inferences are to be viewed on a case-by-case basis and in light of the notice demands of procedural due process, and that, so tested, fair notice is not present here.[10]

REVERSED AND REMANDED

---

**10.** In view of the remand that we order, and of the court's expressed dissatisfaction with the sketchy evidence as to damages presented below, we conclude that a complete new trial is the preferable course to follow.