**HOME LIFE INSURANCE COMPANY, NEW YORK, Plaintiff-Appellee Cross-Appellant,**

v.

**EQUITABLE EQUIPMENT COMPANY, INC., Defendant-Appellant Cross-Appellee.**

No. 80–3874.

United States Court of Appeals, Fifth Circuit.

July 19, 1982.

Rehearing Denied Aug. 25, 1982.

Brian, Simon, Peragine, Smith & Redfearn, A. Morgan Brian, Jr., New Orleans, La., for defendant-appellant cross-appellee.

Herman & Herman, Russ M. Herman, Shelley C. Herman, New Orleans, La., Thomas F. Coughlin, New York City, for plaintiff-appellee cross-appellant.

Before GEE, RUBIN and GARZA, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

This case turns on a single question of law: is an employer liable for the fraudulent misrepresentations of his employee made to further the employee's peculations while apparently acting for the employer in the course of the employer's business? Our jurisdiction being founded on diversity, as surrogate Louisiana judges we conclude that Louisiana courts would visit responsibility on the employer, and we, therefore, affirm the judgment of the district court finding the employer liable. Finding that the district court did not allow the injured third party the full measure of damages due, however, we reverse and remand for the entry of judgment in the larger amount we find owing.

I.

Home Life Insurance Company ("Home Life") provided group medical benefits insurance coverage for the employees of Equitable Equipment Company ("Equitable," now Equitable Shipyards, Inc.). As is customary in administering such group policies, Equitable provided the insurance administrator to prepare and handle claims. These duties were performed by an Equitable employee, Bernard Sciambra. Equitable employees who made claims under the group medical coverage filled out and signed the employee portion of the claim form supplied to them, asked their physician to sign another part of that form, and attached required supporting documents, such as medical expense bills. They submitted the documents to Sciambra for processing. It was Sciambra's duty to verify that the employee-claimant was covered, sign the employer portion of the form, and forward the form to Home Life's regional claims office in Atlanta. There, Home

Life's claims personnel further processed the claim, prepared payment drafts, and returned them by mail to Sciambra. Upon receiving the draft from Home Life's Atlanta office, Sciambra delivered it to the claimant.

Sciambra submitted a mixture of valid and fraudulent claims to Home Life. The bogus claims were contrived in a variety of ways that involved altering only portions of valid supporting documents, such as exaggerating medical facts and conclusions, increasing the length of time and unit rates of cost involved, fabricating documents, and forging signatures of claimants and physicians. Sciambra was the sole perpetrator of the fraud on some false claims. In these cases, when Sciambra altered valid claims, the claimants were completely unaware of his fraud, and Sciambra pocketed the proceeds. In most instances, however, Sciambra conspired with the claimant. When Home Life's payment draft on a fraudulent claim arrived, Sciambra obtained the signature of his co-conspirator, cashed the draft, and split the money with the named claimant.

When Home Life raised Equitable's premiums as a result of a high loss experience, Equitable investigated and learned of Sciambra's misdeeds. Equitable fired Sciambra. He and his co-conspirators were prosecuted for federal crimes. Sciambra was convicted and sentenced to imprisonment. He has now served his time and has been released from prison.

Some restitution to Home Life has been made by Sciambra and certain of his co-conspirators. But Home Life sustained a net loss in connection with the money it paid out on the fraudulent claims over the years. Home Life, therefore, sued Equitable and Sciambra jointly in the instant action, for recoupment of that loss. Equitable denied

any liability to Home Life, but alternatively sought indemnity against Sciambra.

After a bench trial, the district court judge rendered judgment for Home Life in the amount of $34,706.63 against Sciambra and Equitable, and for Equitable against Sciambra in like amount. Equitable was expressly exonerated of negligence in hiring and supervising of Sciambra and in failing to learn of his fraudulent activity, but was cast solely on the basis of vicarious liability.

## II.

■ Article 2320 of the Louisiana Civil Code sets forth the Louisiana equivalent of the common law rule of *respondeat superior*. That article provides in relevant part:

> Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed.

La.Civ.Code Ann. art. 2320 (West 1979). We need consider, therefore, only whether the harm Sciambra visited on Home was "occasioned . . . in the exercise of the functions in which [he was] employed."

In *LeBrane v. Lewis*, 292 So.2d 216 (La. 1974), Justice Tate (now Judge Tate of this court) held that a supervisor's intentional stabbing of a recently discharged employee was within the scope of the supervisor's employment, thus rendering the employer liable for the injuries inflicted by the supervisor. In reaching this conclusion, Justice Tate stated, "the tortious conduct of the supervisor was so closely connected in time, place, and causation to his employment-duties as to be regarded a risk of harm fairly attributable to the employer's business, as compared with conduct motivated by purely personal considerations entirely extraneous to the employer's interests." *Id.* at 218.[1]

---

1. One Louisiana appellate court has interpreted *LeBrane* as setting forth a four-part test to determine whether the employee was acting within the scope of employment:

   (1) Whether the tortious act was primarily employment-rooted;

   (2) Whether the [act] was reasonably incidental to the performance of the employee's duties;

   (3) Whether the act occured on the employer's premises; and

   (4) Whether it occurred during the hours of employment.

Sciambra's fraudulent conduct was certainly connected in time and place to his employment. The district court judge found that 90% of the fraudulent claims were concocted at the job-site, on Equitable's time. Sciambra's conduct was also causally related to his employment duties for Equitable. As the district judge found, 90% of the fraudulent claims were accomplished through collaboration with Equitable employee-claimants. Most of the fraudulent claims were exaggerations of essentially valid claims. Nor can it be said that Sciambra's conduct was "motivated by purely personal considerations entirely extraneous to the employer's interests." *LeBrane*, 292 So.2d at 218. This is not a case where an employee turned aside from his ordinary duties and responsibilities to perpetrate a crime. Sciambra's actions were carefully contrived to fit into his normal duties and the usual course of events.[2] Therefore, we hold that Sciambra was acting in the course and scope of his employ-

ment as defined by article 2320, *LeBrane*, and *Miller*, and Equitable is liable for his conduct.[3]

This holding accords with the result in *Riley v. Wiseman*, 395 So.2d 384 (La.Ct.App. 1981). There the court held that the employer-insurance agency was liable for the damage resulting from the issuance of bogus performance bonds by its employee: the employee's actions "although personally motivated, were so closely interwoven with his employer's business that it can be said to be 'a risk of harm fairly attributable to the employer's business.'" *Id.* at 387 (quoting *Mays v. Pico Fin. Co.*, 339 So.2d 382 (La.Ct.App.1976), *writ denied*, 341 So.2d 1123 (La.1977)).[4]

■ The same result would obtain under the common law concept of *respondeat superior* which is virtually identical to the civil law concept of vicarious liability set forth in article 2320.[5] The Restatement

*Miller v. Keating*, 339 So.2d 40, 44 (La.Ct.App. 1976). The Supreme Court of Louisiana considered the test applied by the court of appeals, however, and stated:

> We did not mean to suggest in *LeBrane* that in all cases of an employer's vicarious liability for the intentional torts of his employee that these four inclusive factors must be met before liability can be found. . . . It was our general evaluation of the circumstances of the tort in *LeBrane* as being one which evolved out of a dispute relating to the employment, one which was reasonably incident to the steward's duties as a hotel employee, and one which was closely connected to those duties (rather than a purely personal matter) which prompted us to regard the incident as one where the risk of harm was fairly attributable to the employer's business.

*Miller v. Keating*, 349 So.2d 265, 268–69 (La. 1977).

2. *See Poydras v. Parker*, 392 So.2d 94, 96 (La. Ct.App.1980) ("the mere fact that an employee's conduct is contrary to his employer's express directions, rules or wishes is not conclusive of the issue of scope of employment").

3. Equitable asserts that article 2320 is to be strictly construed. However, recent Louisiana cases have not so construed it. *See LeBrane v. Lewis*, 292 So.2d 216, 218 n.3 (La.1974) ("aside from isolated expressions in intermediate opinions, we find no modern authority to support the holding that the requirement be strictly construed in favor of the employer in tort

cases"); Note, Corporation's Liability for Intentional Torts of its President—A Change in "Scope," 24 Loy.L.Rev. 145, 146 (1978) ("The modern trend . . . has been to extend an employer's responsibility for intentional torts of his employees which are reasonably connected with employment.").

4. [T]he fact that the [employer] was without knowledge of [the employee's] peculations and did not benefit as a result thereof is likewise insufficient to excuse it from liability for the consequences of his deceit. The test in determining the responsibility of a principal in this type of case is whether the agent was cloaked with the apparent authority to perform the acts which resulted in the loss and not whether he was actually vested with such authority.

*Yoars v. New Orleans Linen Supply Co.*, 185 So. 525, 528 (La.Ct.App.1939).

5. *See Blanchard v. Ogima*, 253 La. 34, 43 n.3, 215 So.2d 902, 905 n.3 (La.1968) ("There is a parallel development and history of vicarious liability in [the civilian and common law] jurisdictions with almost simultaneous extensions or limitations of responsibility by statute or jurisprudence. . . . So actually the common law does not present a departure from our civilian law in this field."); Comment, Tort Law in Louisiana—The Supplementary Tort Articles 2317–2322, 44 Tul.L.Rev. 119, 143 (1969) ("Louisiana jurisprudence has equated the phrase 'in the exercise of the functions in

(Second) of Agency leads to an easy solution.[6] The Restatement provides that the misrepresentations of a servant are governed by the same rules applicable to the misrepresentations of an agent.[7] Then the Restatement provides: "A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." Restatement (Second) of Agency § 261 (1957).[8] The comments and illustrations to § 261 make clear its application in a case such as the present one. For instance:

> A, local manager of P, a telegraph company, gives padded statements of account to T, a patron of the company, who pays in accordance with such statements. A deposits the money to P's credit, withdraws the surplus, and absconds. P is subject to liability to T for the excessive payments.

*Id.* comment a, illustration 2. Such a result is explained by the comment:

> Liability is based upon the fact that the agent's position facilitates the consummation of the fraud, in that from the point of view of the third person the transaction seems regular on its face and the agent appears to be acting in the ordinary course of the business confided to him.

*Id.* comment a.

Equitable placed Sciambra in a position to defraud Home Life while he was apparently acting within his authority to process and submit claims to Home Life. His position facilitated the consummation of the fraud and Equitable should, therefore, be liable for the unfortunate consequences of the fraudulent activity.

### III.

■ On cross appeal Home Life asserts that the district court's award of damages in the amount of $34,706.63 is erroneous. The district court credited the testimony and theory of damages set forth by Equitable's expert, Roch E. E. deMontluzin, an independent insurance broker, and calculated the amount of Home Life's loss, based on this testimony, as follows:

| | |
|---|---|
| Total loss sustained by Home Life on all claims | $146,671.00 |
| Less: Restitution | 15,466.37 |
| Claims Run-Outs | 12,750.00 |
| Pooling Credit | 39,813.00 |
| Excess Negative absorbed | 43,935.00 |
| Net Loss to Home Life | $34,706.63 |

This theory is based on the premise that Equitable in fact paid the cost of the fraud-

which they are employed' with the phrase 'in the course and scope of employment' used in the common law doctrine of *respondeat superior.*"); Note, Vicarious Liability and Intentional Torts: *LeBrane* Refined, 38 La.L.Rev. 832, 834 (1978) ("Louisiana jurisprudence has drawn upon the common law in interpreting article 2320 to such a great extent that it is difficult to sever the civil and common law theories.").

**6.** The Restatement of Agency has, indeed, been cited approvingly by several Louisiana courts. *E.g., LeBrane v. Lewis*, 292 So.2d 216, 219 (La.1974) (citing Restatement (Second) of Agency §§ 219, 228, 229, 233, 234, 245); *Blanchard v. Ogima*, 215 So.2d 902, 906 (La. 1968) (citing § 250); *Lou-Con, Inc. v. Gulf Bldg. Servs., Inc.*, 287 So.2d 192, 199–200 (La. Ct.App.1973) (citing §§ 214, 231, 261), *writ denied*, 290 So.2d 899, 901 (La.1974); *Fidelity Nat'l Bank v. Central Mfrs. Mut. Ins., Co.*, 48 So.2d 668, 671–72 (La.Ct.App.1950) (citing Restatement of Agency §§ 261, 262); *Yoars v. New Orleans Linen Supply Co.*, 185 So. 525,

528 (La.Ct.App.1939) (citing Restatement §§ 261, 262); *cf. Arceneaux v. Texaco, Inc.*, 623 F.2d 924, 926 (5th Cir. 1980) ("Louisiana courts have drawn freely from the common law and the Restatements of the law in developing both tort and agency doctrine.") (following the Restatement (Second) of Agency in an apparent authority case), *cert. denied*, 450 U.S. 928, 101 S.Ct. 1385, 67 L.Ed.2d 359 (1981).

**7.** "A master is subject to liability for the misrepresentations of a servant causing pecuniary loss as he is for the misrepresentations of an agent who is not a servant." Restatement (Second) of Agency § 249 (1957).

**8.** *See also id.* § 262 ("A person who otherwise would be liable to another for the misrepresentations of one apparently acting for him is not relieved from liability by the fact that the servant or other agent acts entirely for his own purposes, unless the other has notice of this.").

ulent claims during the first three policy years.[9] It is true that the amount Home Life billed Equitable for premiums exceeded the amount paid out on claims for the first three years of the policy experience. This does not mean, however, that this difference measures Home Life's loss. Home Life is entitled to recover not only its out-of-pocket loss but the profits it failed to realize as a result of the filing of fraudulent claims.[10]

Attempting to reconstruct the amount of the loss to Home Life on this basis, we find that the parties stipulated the total amount of fraudulent claims paid by Home Life to be $115,632.42.[11] The parties also agreed that Home Life's loss had been reduced by $15,446.37, representing the amount of restitution made by Sciambra.[12] Moreover, Richard Schultz, the underwriting secretary of Home Life during the relevant period, who was qualified at trial as an expert witness, testified that Equitable would have been entitled to a reduction in premiums of $29,066 if the fraudulent claims had not been made. This aspect of Mr. Schultz's testimony was not contradicted by Equitable.

From these simple facts, agreed upon by the parties, it appears that the amount of

---

9. The district court opinion explained this holding:

   In our opinion the theory advanced by Mr. deMontluzin—who the Court found to be a most knowledgeable and candid witness—takes into account the special nature of the relationship between a group insurer and its insured. We are convinced that, as Equitable asserts, it did in fact pay the cost of the fraudulent claims during the first three policy years. Thereafter, even deducting the fraudulent claims, Home Life would have suffered some loss based upon the Equitable non-fraudulent claims experience. This is a risk inherent in the insurance business. We do not feel that Home Life should be placed in any better a position because of the filing of the fraudulent claims than it would have been in had they not in fact been submitted.

10. See A. E. Landvoight, Inc. v. Louisiana State Employees' Retirement Sys., 337 So.2d 881, 886 (La.Ct.App.) ("Lost profits may be recovered as damages where they are not speculative or uncertain in nature and are susceptible of proof with reasonable certainty."), writ denied, 339 So.2d 852, 853 (La.1976); Lottinger v. Mark II Elecs. of La., Inc., 179 So.2d 644, 647 (La.Ct. App.1965) ("Plaintiffs are entitled to be restored to the identical position they would have been in had the illegal mortgage not been executed.").

   Moreover, we note that the deMontluzin theory starts with a total loss figure of $146,671.00. As Mr. Schultz testified, this figure represents the loss to Home Life during the policy period on all claims, legitimate and fraudulent. According to Home Life counsel, the figure was prepared to counter Equitable's pre-trial assertion that Home Life had suffered no loss on the policy. Specifically, Home Life's counsel stated: "[I]n the pleadings Equitable has asserted in a defensive position that Home Life had no loss on the case. And the only relevance of that document [containing the $146,671 figure] is to show an actual loss. It is not for the purpose of proving the amount of damages recoverable due to fraud."

   Nor are we satisfied that Equitable is entitled to an offset for either the "pooling credit" or the "excess negative absorbed." Equitable has no contractual right for return of these amounts and the record does not show why Equitable is due their benefit.

11. We note that there was some confusion as to the exact amount of fraudulent claims. Counsel for Home Life and Equitable agreed to a proposed finding of fact that the total of fraudulent claims was $115,874.05. This figure was apparently based on an exhibit prepared by Home Life. The parties later stipulated as to the amount of fraudulent claims incurred in each of several years. These amounts sum to $115,632.42. The district judge accepted the latter figure, although we note that the table included in his opinion misstates the amount of fraudulent claims for one year by $1,000. This was apparently a typographical error, as the total of $115,632.42, is equal to the sums of the amounts for each year, as stipulated. In any event, although Home Life's brief to this court continued to assert that the stipulated amount of fraudulent claims was $115,874.05 (without recognizing the discrepancy between this figure and the amount asserted by Equitable and the district judge), counsel for Home Life stated in oral argument before this court that $115,632 was the amount of fraudulent claims. Therefore, since all parties now agree, we accept this figure.

12. If, on remand, the district court finds that Sciambra has submitted additional amounts to Home Life as restitution subsequent to the time of trial, these amounts shall accordingly reduce the amount of loss that we find Home Life incurred as a result of the fraud.

loss suffered by Home Life as a result of the fraudulent claims is:

| | |
|---|---|
| $115,632.42 | (the amount of fraudulent claims paid) |
| − 15,446.37 | (the amount of restitution) |
| $100,186.05 | (amount of fraudulent claims paid less restitution) |
| − 29,066.00 | (reduction for increased premiums paid by Equitable as a result of the fraud) |
| $ 71,120.05 [13] | |

In the absence of the fraudulent claims, the difference between the billed premiums and the incurred claims would have been greater. This would, in turn, have resulted in a reduction in the billed premiums in later years, and Home Life's gross loss must be offset by the reduced premium income that would otherwise have accrued. Therefore, we have reduced the amount of loss suffered by Home Life by $29,066, the amount Equitable's premiums would have been reduced in the absence of fraud.

Accordingly, we affirm the finding of liability of Equitable for the fraudulent acts of its employee, and from the undisputed facts in the record, we reverse the award of damages in favor of Home Life of $34,-706.63 and remand to the district court for entry of judgment in favor of Home Life in the amount of $71,120.05 as against Equitable, and in the amount of $100,186.05 as against Sciambra.

AFFIRMED IN PART.

REVERSED AND REMANDED IN PART.

---

As against Sciambra, Home Life is entitled to recover $100,186.05, for Sciambra should not receive the benefit of the $29,066 offset attributable to higher premiums paid by Equitable as a result of the fraud. Sciambra did not choose to file briefs in this court, but the notice of cross-appeal alerted him that he might be subject to increased liability as a result of this appeal.