DOMAR OCEAN TRANSPORTATION, LTD., a DIVISION OF LEE–VAC, LTD., Plaintiff-Appellee,

v.

INDEPENDENT REFINING COMPANY, Defendant-Appellee,

v.

MILFORD NAVIGATION COMPANY, Third-Party Defendant-Appellant.

No. 82–3603.

United States Court of Appeals, Fifth Circuit.

Feb. 14, 1986.

M.D. Yager, Gregg L. Spyridon, New Orleans, La., for Milford Navigation Co.

James G. Burke, Jr., Daniel E. Knowles, III, New Orleans, La., for Lee Vac.

Michael K. Clann, Houston, Tex., for Independent Refining.

Before GARWOOD, HIGGINBOTHAM and DAVIS, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Milford Navigation Company (Milford) owned and operated a tanker vessel, OLYMPIC GLORY, which was engaged in transporting crude oil and other petroleum products for Amoco, the time charterer of the vessel. When the vessel called in New Orleans to take on cargo, the captain of the OLYMPIC GLORY, Athanasios Varelas, made arrangements to sell residue in the vessel's tanks—slops—to Inco Petroleum, Inc. (INCO). INCO in turn agreed to sell the slops to Independent Refining Company (IRC). IRC arranged with appellee Domar to provide a tug and tank barge and transport the slops from the OLYMPIC GLORY in New Orleans to an oil refinery in Port Arthur, Texas for $145 per hour. As between Domar and IRC, IRC was contractually obligated to provide the necessary documents to clear the slops through United States Customs. INCO agreed to perform this same service for IRC and also agreed to indemnify IRC against liability arising out of the transportation of the slops. Domar did not have adequate vessels available for the tow, so it chartered from another company the barge DXE–101 for $200 per day and the tug NORMA R for $93 per hour. The contract between Domar and IRC contained a force majeure clause disclaiming liability of either party in the event of "arrest or restraint of princes, rulers or people."

On January 2, 1981, the cargo was off-loaded from the OLYMPIC GLORY onto the DXE–101, and Captain Varelas certified that the product was 600 barrels of slops. The tug proceeded to Port Arthur, Texas, arriving on January 5, 1981, where United States Customs Service seized the barge and cargo because of improper customs declarations. Following the seizure it was learned that the product that had been lightered from the OLYMPIC GLORY to the DXE–101 was actually uncontaminated crude oil owned by Amoco. The captain of the OLYMPIC GLORY was later indicted and convicted of stealing the crude. *United States v. Varelas*, Cr.D. No. 81–62, Section B (E.D.La. April 15, 1981).

The tug was released from seizure and returned to the fleet on February 1, 1981. The barge was released on March 18, 1981, and Domar's tug JOHN ROD completed the tow back to New Orleans on April 1, 1981. Domar sued IRC and sought recovery for the services of its vessels at the contract rate of $145 per hour from January 1 to April 1, 1981, the entire period from the commencement of the tow until the barge was released from seizure and returned to New Orleans. IRC sought indemnification from Milford and INCO. INCO went out of business before trial and did not defend against IRC's claim.

The district court held that: (1) IRC was liable to Domar for $59,395, including $40,320 for the services of the vessels as provided in the contract for the period before the seizure, and $19,075 for the tow from Port Arthur to New Orleans after release of the barge. Because of the force majeure clause in its contract with Domar, IRC was exonerated from liability for loss of the vessels while they were under seizure; (2) IRC was given indemnity from INCO for this amount under the contract of indemnification between them; and (3) following the trial the district court permitted Domar to amend its petition to name Milford as a direct defendant and permitted IRC to amend its third party complaint to demand judgment in favor of Domar directly against Milford. Following this amendment, INCO and Milford were solidarily cast for Domar's out-of-pocket expenses incurred while the barge was under seizure. The district court also cast INCO and Milford for Domar's attorneys' fees both for its efforts in securing release of the barge and for "collection charges."

Apparently Milford is the only solvent judgment creditor because it alone appeals. It charges that the district court erred by: (1) allowing post-judgment amendment of

the pleadings; (2) imputing the unauthorized, willful misconduct of Captain Varelas to it; and (3) awarding Domar attorneys' fees. Domar cross-appeals, contending that the district court erred in awarding damages only for out-of-pocket expenses, rather than for lost profits, during the seizure of the barge. Because the order authorizing the post-judgment amendment was erroneous, we vacate the judgment and remand for a supplemental hearing.

### A.

When this case was tried, Milford was in the case only as a third party defendant to IRC. Following the trial the district court entered judgment in favor of Domar and against Milford. Domar then sought permission to amend its complaint to assert a claim directly against Milford. IRC filed a similar motion to amend its third party complaint to demand judgment directly in favor of Domar and against Milford. The district court permitted Domar and IRC to amend their pleadings, as requested, to conform the pleadings to the evidence. Milford contends the district court erred in permitting these amendments.

■ A post-judgment amendment to conform the pleadings to the evidence and assert claims not raised by the pleadings is permitted in the limited circumstances provided by Rule 15(b) F.R.Civ.P:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; ...

The relevant inquiry, therefore, is whether Milford either expressly or impliedly consented to trial of its direct liability to Domar. *See Jimenez v. Tuna Vessel GRANADA*, 652 F.2d 415 (5th Cir.1981); *International Harvester Credit Corp. v. East Coast Truck and R.V. Sales, Inc.*, 547 F.2d

888 (5th Cir.1977); 6 Wright & Miller, *Federal Practice and Procedure* : Civil § 1491 at 455.

■ Domar does not contend and the record does not support a finding that Milford gave its express consent to the trial of its liability to Domar. Remaining is the question of whether Milford gave its implied consent to the trial of its liability to Domar. In general, a finding of implied consent "depends on whether the parties recognized that an issue not presented by the pleadings entered the case at trial." *Jimenez*, 652 F.2d at 421. "Where a party does not recognize the significance of evidence and so fails to contest it, he cannot realistically be said to have given his implied consent to the trial of unpled issues suggested by it, always assuming that his failure to grasp its significance was reasonable." *Id.;* Wright & Miller, § 1493, at 468–69. When evidence is introduced that is relevant to a pleaded issue and the party against whom the amendment is urged has no reason to believe a new issue is being injected into the case, that party cannot be said to have impliedly consented to trial of that issue. *International Harvester*, 547 F.2d at 890; *Jimenez*, 652 F.2d at 421.

■ Our review of the record fails to reveal that Milford slept on its rights and thereby consented to the trial of Domar's direct claim against Milford. When Domar attempted to elicit testimony supporting its theory that Milford was vicariously responsible for the acts of Captain Varelas, Milford immediately objected. The evidence was admitted only after counsel for Domar assured the court that the evidence was relevant only to IRC's third party claim for indemnity against Milford. IRC's tort indemnity claims against Milford was bottomed on the contention that the misconduct of Captain Varelas was responsible for the seizure of Domar's vessels and that Milford was vicariously responsible for its captain's acts. Milford defended the third party complaint on grounds that: (1) the vessels were seized because inadequate or improper documents related to the cargo were provided to the United States Cus-

toms Service, rather than because the crude oil was stolen by Captain Varelas; (2) even if Captain Varelas' misconduct contributed to the seizure, Milford was not vicariously responsible for Captain Varelas' acts; and (3) Domar's tug captain and representatives of IRC and INCO were negligent and their negligence contributed to the seizure. The evidence admitted at trial was relevant to the claims of Domar against INCO and IRC, the third party demand of IRC against Milford and the defenses of Milford to IRC's third party demand. We conclude that the introduction of evidence on these issues gave Milford no fair notice that Domar was asserting a direct claim against Milford.

Domar argues forcefully that Milford had an opportunity to fully defend IRC's tort indemnity claim that was identical to the tort claim Domar asserted against Milford and that Milford has articulated no prejudice as a result of the amendment permitted by the trial court. The short answer to Domar's contention is that Rule 15(b) sets the standard for ruling on posttrial motions to amend to conform the pleadings to the evidence and lack of prejudice by Milford was not sufficient grounds under that rule to permit the amendment; consent to the amendment by Milford was required. Rule 15(b) recognizes that basic fairness entitles a defendant to notice, before trial, of who sued it and the nature of the claims being asserted against it. It may well be impossible for a party to articulate particular grounds of prejudice when the court permits a party to make post-trial amendments and allege new issues which the party has not had an opportunity to investigate or even consider.

Because the record does not disclose that Milford gave its express or implied consent to the amendment of the pleadings which incorporated for the first time after trial a direct claim by Domar against Milford we conclude that the judgment against Milford must be vacated and the case remanded to give Milford an opportunity to assert any additional defenses it may have to the demand of Domar.

We are presented with the unique circumstance that Milford defended a tort indemnity claim asserted against it by IRC which, so far as we can determine, was predicated on the same facts as the claim of Domar. The only factual issues that Milford suggests were not thoroughly tried relate to Domar's fault and the contributing fault of IRC and INCO. Milford in fact asserted these same defenses in defending against IRC's third party demand and Milford does not articulate with any particularity what additional evidence it can produce in a supplemental evidentiary hearing. Anticipating therefore that the facts before the district court following the supplemental evidentiary hearing on remand will be substantially the same as those presently in the record, and to aid the district court in deciding the case following the hearing on remand, we proceed to a consideration of the remaining issues raised by Milford on appeal. We do this, of course, with the reservation that the district court should consider our treatment of the remaining issues in light of any additional evidence produced by Milford on remand.

#### B.

Milford asserts several reasons why it was improperly cast in damages for Domar's loss suffered during the period of the seizure: (1) the seizure did not result from Captain Varelas' misconduct but rather because INCO and IRC failed to provide proper customs documents; (2) alternatively, the captain's misconduct was outside the scope of his authority and this conduct cannot be imputed to Milford; and (3) the actions of the captain related to cargo and were performed as agent for the charterer, making Amoco, rather than Milford, vicariously responsible for those acts.

Milford contends that the seizure resulted from the failure of IRC and INCO to comply with customs regulations, rather than the fact that the oil was stolen. Domar argues that the seizure was initially made in part because the product was uncontaminated crude oil rather than slops as

declared on the customs papers and further that the retention of the barge for such a prolonged period is attributable to the fact that the crude was stolen. The record supports Domar's contentions. A receipt issued by United States Customs on January 8, 1981 included the following "Reason for Retention": "Detained 2,983 G/B crude oil in above listed vessel [Barge DXE–101] for further investigation by the Customs Service. Discharge of cargo not authorized." A letter to Domar from Katherine C. Peterson, Chief of the Miscellaneous Penalties Branch of the United States Customs Service, stated that the initial seizure was the result of a determination that "no entry had been filed on the oil in Gramercy [where the cargo was transferred to the DXE–101], and that the 'slops' were actually crude oil."

 Milford also argues that it has no liability for the unauthorized, criminal acts of the captain because they were committed outside the scope of his employment. The fact that an employee engages in intentional tortious or criminal activity does not necessarily require a finding that he was acting outside the scope of his employment. "An act may be within the scope of employment although consciously criminal or tortious." *Restatement (Second) of Agency* § 231. "A master is subject to liability for a trespass or a conversion caused by an act done by a servant within the scope of employment." *Id.* at § 244. In this circumstance where the theft of the crude was closely related to Captain Varelas' authorized duties, the district court did not err in holding the employer vicariously responsible for the captain's acts. Acts committed by a servant are considered within the scope of employment when they "are so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of the employment." Prosser and Keeton, *The Law of Torts* 502 (5th ed. 1984). Among the factors considered to determine whether acts are within the scope of employment are: (1) the time,

place and purpose of the act; (2) its similarity to acts which the servant is authorized to perform; (3) whether the act is commonly performed by such servants; (4) the extent of departure from normal methods; (5) the previous relations between the parties; and (6) whether the master would reasonably expect such an act would be performed. *Id.*

Applying this test to the facts of today's case, the district court did not err in concluding that Captain Varelas acted within the scope of his employment in the theft and sale of the cargo. Captain Varelas' theft of the cargo took place while he was serving as master of the vessel and the purported sale of slops was indistinguishable from legitimate sales of slops routinely made by masters of tanker vessels. The transaction in question was similar to a previous transfer of slops from the OLYMPIC GLORY in which Domar participated. Although the record discloses no reason Milford should have expected the captain to steal the cargo, this factor is outweighed by the other considerations discussed above. *See Home Life Insurance Co. v. Equitable Equipment Co.*, 680 F.2d 1056, 1959, *damages modified*, 694 F.2d 402 (5th Cir.1982).

Milford contends that because Captain Varelas' misconduct in selling Amoco's crude oil related to cargo, Amoco—not Milford—is vicariously responsible for the captain's acts if they are to be imputed to any principal. Milford's argument that Amoco should be responsible is bottomed on paragraph 38 of its time charter with Amoco, which provides: "Owner agrees to follow Charterer's instructions with respect to the handling of oily residues and tank washings throughout the period of the Charter." This provision may well require Milford to obtain Amoco's authority to sell slops, but it cannot affect the rights of Domar, a stranger to that contract.

 Milford also argues that the industry recognizes that captains customarily act as agents for the charterer in selling slops and that Amoco—not Milford—should

therefore be responsible as Captain Varelas' principal here. Milford's argument misses the mark. We are not presented with a question of whether Milford or Amoco should be liable for adverse consequences resulting from the captain's legitimate sale of slops. Rather, we are confronted with a question of who should be liable for the captain's criminal misconduct contrary to the interests of both his employer, Milford, and the charterer, Amoco. It would indeed be a novel result to impute Captain Varelas' acts to Amoco, the party whose property was stolen, when Amoco did not hire Captain Varelas and exercised no supervision or control over him.

The general rule that governs the question under consideration is stated in *Restatement (Second) of Agency* § 261 as follows: "A principal who puts a servant or other agent in a position which enables the agent, while apparently acting within his authority, to commit a fraud upon third persons is subject to liability to such third persons for the fraud." Milford hired, paid, supervised and had the power to discharge Captain Varelas. Because Milford placed Captain Varelas in a position to defraud Domar and steal from Amoco, and because Milford was the only party in control of the captain, it must shoulder the responsibility for his acts. Milford does not argue or point to any evidence in the record that Amoco exercised control over Captain Varelas to support a finding that Varelas became the borrowed employee of Amoco. Consequently Milford was Varelas' employer and responsible for his acts. *See Hebron v. Union Oil Co.,* 634 F.2d 245, 247 (5th Cir.1981); *Benoit v. Transco Exploration Co.,* 577 F.Supp. 304, 307 (W.D.La.1983), *aff'd mem.,* 739 F.2d 631 (5th Cir.1984).

### C.

Milford challenges the district court's award to Domar of $8,621.60 in attorneys' fees expended in securing release of the DXE–101, and $10,000 in attorneys' fees as "collection charges." Ordinarily, attorneys' fees incurred in the defense or prosecution of a case may not be awarded as an element of damage except where specifically authorized. *Noritake Co. v. M/V HELLENIC CHAMPION,* 627 F.2d 724, 730 (5th Cir.1980). The authorities relied on by Domar to support its recovery of the fees for collection all relate to claims for attorneys' fees incidental to an indemnity claim; they do not support Domar's claim for attorneys' fees incidental to a direct tort action. Because attorneys' fees for recovery of tort damages are not authorized, the $10,000 award for this item was erroneous.

The $8,621.60 award for fees incurred in seeking the release of the barge presents a different problem. "[A] vessel owner is required to mitigate damages and may not recover damages for losses resulting from the owner's failure to use reasonable measures to halt the progress of damage." *Delta Steamship Lines, Inc. v. Avondale Shipyards, Inc.,* 747 F.2d 995, 1003 n. 23 (5th Cir.1984). Domar incurred these fees in an attempt to secure release of the barge and thus mitigate its damages. Sums reasonably expended in mitigating damages are recoverable against the defendant's cost in judgment in a tort action. *Id.* at 1007–08. The district court therefore did not err in assessing the $8,621.60 attorneys' fee award.

### D.

Domar contends the district court erred by awarding only its out-of-pocket expenses—the charter hire Domar paid for the DXE–101 and NORMA R—for the period of time these vessels were held. Domar does not contend that Milford is responsible for profit lost on the vessels before the seizure or after the vessels were released. Domar contends it should have been awarded its lost profits on these vessels during the seizure.

Damages for lost profits are allowed against a tortfeasor under the general maritime law only when the amount of such profits is proved with reasonable certainty. *Bolivar County Gravel Company v. Thomas Marine Co.,* 585 F.2d 1306, 1308

n. 2 (5th Cir.1978) (quoting *The CON-QUEROR*, 166 U.S. 110, 125, 17 S.Ct. 510, 516, 41 L.Ed. 937 (1897)); *see Delta Steamship Lines Inc. v. Avondale Shipyards, Inc.*, 747 F.2d 995, 1000 (5th Cir.1984). Domar produced no evidence to establish that it had demand from customers for the DXE–101 and NORMA R during the period of the seizure and thus did not prove with reasonable certainty that profits were lost. Moreover, there is no indication that Domar could not have chartered substitute vessels and made the same profit as with the DXE–101 and NORMA R had this demand existed. Because the proof failed to establish that Domar sustained lost profits from these vessels, the district court correctly limited the award to Domar's out-of-pocket loss—the charter hire paid for the vessels while they were under seizure.

VACATED and REMANDED.