**JACKSON MARINE CORPORATION, Richard G. Trudell, Felis F. Denton, III, et al., Plaintiffs–Appellants,**

v.

**BLUE FOX, its Tackle, Gear, Apparel, etc., et al., Defendants–Appellees.**

No. 87–3167.

United States Court of Appeals, Fifth Circuit.

May 31, 1988.

Overton T. Harrington, Jr., Waldmann & Harrington, Gretna, La., for plaintiffs-appellants.

Lawrence E. Abbott, Gary P. Landry, Herbert & Abbott, New Orleans, La., for defendants-appellees.

Before KING* and DAVIS, Circuit Judges, and PARKER,** District Judge.

W. EUGENE DAVIS, Circuit Judge:

Jackson Marine, the owner of the M/V MISTER JEAN, together with the vessel's captain and crew, appeal the district court's dismissal of their salvage claim on the ground that the fraud of the captain of MISTER JEAN bars their recovery for salvage. We affirm the district court's denial of a salvage award to the captain and owner of the MISTER JEAN and reverse the denial of an award to the crew.

### I.

On July 14, 1981, the M/V BLUE FOX, carrying an explosive mid-deck cargo of dozens of oxygen-acetylene bottles, caught fire, some sixty miles off of Sabine Pass, Texas, in the Gulf of Mexico. After unsuccessfully attempting to extinguish the fire, the crew abandoned ship and were rescued by a nearby boat. The crew was eventually transferred to the M/V VIGILANTE FORCE on which they radioed for help. The MISTER JEAN, owned by Jackson Marine Company (Jackson Marine), answered the distress signal and extinguished the fire.

This is the second time these parties have been before this court. In *Black Gold Marine, Inc. v. Jackson Marine Co.*, 759 F.2d 466 (5th Cir.1985), we upheld the district court's determination that Captain Trudell of the MISTER JEAN had

---

* Formerly Carolyn Dineen Randall.

** District Judge of the Eastern District of Texas, sitting by designation.

fraudulently procured a salvage contract from Captain Totten of the BLUE FOX. Because the facts determined in *Black Gold Marine* bear significantly on this appeal, we set forth below facts important to that opinion.

After extinguishing the fire on the BLUE FOX, Captain Trudell offered to tow the BLUE FOX (whose engines were inoperative) to a safe port if Captain Totten would agree to sign an instrument that would protect the MISTER JEAN from any liability incurred as a result of the tow. In reality, the form contract that Captain Trudell presented to Captain Totten permitted Jackson Marine to recover for all of the services it performed for the BLUE FOX, including extinguishing the fire. The contract also bound Black Gold Marine, Inc., the owner of the BLUE FOX, to arbitrate with Lloyds Salvage Arbitration Board in London, England, to determine the value of those services. Relying on Captain Trudell's misrepresentations, Captain Totten signed the form instrument only to learn later that he had agreed to a potentially large salvage award in favor of Jackson Marine.

In a declaratory judgment action instituted by Black Gold Marine, the district court declared the salvage contract void due to fraud in the procurement. The district court also found that "Trudell, a captain of twenty years, was intimately familiar with the terms and effect of the salvage agreement, whereas Captain Totten had neither seen nor heard of the document before and that Trudell dishonestly mischaracterized the document to secure Totten's signature." *Black Gold Marine*, 759 F.2d at 469. On appeal, we concluded that the district court's finding of fraud was not clearly erroneous while noting that "[o]ur decision, affirming the district court's invalidation of the salvage contract, in no way limits or affects Jackson's undertaking to vindicate its 'pure salvage' rights against the M/V BLUE FOX in the absence of a salvage contract." *Id.* at 471. In the subsequent trial on the appellants' pure salvage rights the district court concluded that the fraudulent misconduct of Captain Trudell precluded any salvage

award to the owner, captain, or crew of the MISTER JEAN. We now turn to a consideration of the salvage rights of the captain, the owners, and the crew of the MISTER JEAN, respectively.

## II.

A determination of the salvage rights of Captain Trudell is quite straightforward: did the district court err in determining that Trudell's fraudulent misconduct bars his salvage award?

■ Admiralty courts have traditionally been vigilant in protecting mariners from unscrupulous and dishonest salvors. *The Bello Corrunes*, 19 U.S. (6 Wheat.) 152, 5 L.Ed. 229 (1821); *The Albany*, 44 F. 431 (D.Mich.1890). Because of the heightened vulnerability of a distressed ship and crew to exploitation by salvors, "[t]he law cannot ... tolerate salvors [sic] dishonesty, corruption, fraud, falsehood, either in rendering the service, or in their proceedings to recover the salvage." *Church v. Seventeen Hundred and Twelve Dollars*, 5 F.Cas. 669 (S.D.Fla.1853) (No. 2713).

While the appropriate response to a finding of fraud or misrepresentation will depend on the facts of the particular case, the district court had good reason to bar Trudell from any recovery in this case. Trudell, who served as a captain for twenty years, was "intimately familiar with the terms and effect of the salvage agreement." *Black Gold Marine*, 759 F.2d at 469. The district court found that Trudell intentionally took advantage of Totten, who had "neither seen nor heard of the document before." *Id.* The district court did not err in barring Trudell's recovery.

## III.

We next consider whether Trudell's fraudulent conduct and misrepresentations should be imputed to Jackson Marine and bar the owner from any salvage recovery.

■ It is well established in the general maritime law that the master of a vessel is the agent and representative of the owner

and as such can bind the owner by acts performed within the scope of the agency. *Massachusetts Lobstermen's Ass'n, Inc. v. United States,* 554 F.Supp. 740, 742 (D.Mass.1982); *Farmer v. The O/S Fluffy D,* 220 F.Supp. 917, 920 (S.D.Tex.1963); 3A M. Norris, *Benedict on Admiralty,* § 178 (7th ed. rev. 1987). This agency relationship makes the owner responsible both for contracts made by the captain as well as the captain's torts, so long as the torts are committed within the scope of the captain's normal duties and employment.[1] *Domar Ocean Transp. v. Independent Refining Corp.,* 783 F.2d 1185, 1190 (5th Cir.1986); *The Rising Sun,* 20 F.Cas. 828 (D.Me.1837) (No. 11,858); *see also* M. Norris, *supra,* § 108 n. 2 (listing cases).

■ Consistent with general agency principles, the general maritime law imputes to the principal the servant's acts committed within the scope of a servant's employment even though "consciously criminal or tortious." *Restatement (Second) of Agency* § 231 (1977); *Domar,* 783 F.2d at 1190. Intentional acts of misconduct by a servant are considered within his scope of employment when they are "so closely connected with what the servant is employed to do, and so fairly and reasonably incidental to it, that they may be regarded as methods, even though quite improper ones, of carrying out the objectives of employment." W. Prosser and W. Keeton, *The Law of Torts* 502 (5th ed. 1984); *Domar,* 783 F.2d at 1190.

In *Domar,* we considered whether the unauthorized, criminal acts of a captain could be imputed to the vessel owner. In holding the owner vicariously liable for the captain's theft of crude oil, we held that "[t]he fact that an employee engages in intentional tortious or criminal activity does not necessarily require a finding that he was acting outside the scope of his employment." *Id.*

In *Domar,* we applied a number of factors in determining that the actions of the captain were imputable to the owners.

"Among the factors considered to determine whether acts are within the scope of employment are: (1) the time, place and purpose of the act; (2) its similarity to acts which the servant is authorized to perform; (3) whether the act is commonly performed by such servant; (4) the extent of departure from normal methods; (5) the previous relations between the parties; and (6) whether the master would reasonably expect that such an act would be performed." *Id.* (citing W. Prosser and W. Keeton, *supra* at 502).

■ These factors, when applied to this case, strongly militate in favor of imputing Trudell's actions to Jackson Marine. Trudell's actions occurred at a time and place when he was serving as captain of Jackson Marine's vessel and the main purpose of Trudell's misrepresentations was to benefit Jackson Marine. Jackson supplied Trudell with the "Lloyds form" salvage agreement to be executed by a representative of the distressed vessel. Trudell's departure from normal methods related only to his misrepresentations in this case.

In sum, Captain Trudell's misconduct was directly related to duties Jackson Marine assigned to him and the captain's fraud was committed primarily for Jackson's benefit. The district court did not err in imputing Trudell's conduct to Jackson Marine.

## IV.

We now turn to the rights of the crew of the MISTER JEAN to recover a salvage award. While we conclude that misconduct of Captain Trudell should be imputed to Jackson, we find no reason to bar the innocent crew from a salvage award.

■ Although established rules of respondeat superior operate to impute fault up the employment hierarchy, these rules do not operate in the inverse to impute fault down the employment hierarchy. Without individual knowledge or guilt, a servant is not vicariously liable for the

---

1. Commentators are equivocal at best on when the shipowner is barred from obtaining a salvage award due to the captain's intentional misconduct. M. Norris, *supra,* § 108. Gilmore and Black are silent on the salvage rights of the owner in these circumstances.

misrepresentations of his principal. *Restatement (Second) of Torts,* § 348 comment b (1977). Thus, under general agency principles, the crew of the MISTER JEAN is not responsible for the actions of Trudell. This general agency rule is consistent with admiralty principles that traditionally distinguish between the rights and liability of the master and owner on one hand and the crew on the other. For example, a contract for salvage may bind the parties to the agreement but it will not bind the crew of the salving vessel if made without their sanction and concurrence. *The Neptune,* 277 F. 230 (2d Cir.1921); M. Norris, *supra,* § 173; G. Gilmore and C. Black, *The Law of Admiralty,* 567 (2d ed. 1975); *see also Waterman S.S. Corp. v. Dean,* 171 F.2d 408 (4th Cir.1948), *cert. denied,* 337 U.S. 924, 69 S.Ct. 1168, 93 L.Ed. 1732 (1949).

The record evidence suggests no reason to impute the improper actions of Trudell to the crew. Although some members of the crew may have been present during portions of Trudell's conversation with Totten, the record evidence does not suggest, and the district court did not find, that those crewmembers knew of or participated in Trudell's misconduct. Thus, we conclude that the district court erred in denying a salvage award to the crew.

## V. CONCLUSION

The judgment of the district court denying a salvage award to the captain and owners of the MISTER JEAN is affirmed. The judgment denying relief to the crew is reversed and the case is remanded to the district court to determine the amount of the salvage award the crew is entitled to recover.

AFFIRMED in part and REVERSED in part.