876 F.2d 507
 Fed. Sec. L. Rep. P 94,540, 14 Fed.R.Serv.3d 38
 B.J. CRAWFORD, Plaintiff-Appellant,
v.
GLENNS, INC., Deryle Glenn, Des Moines Cold Storage Co.,
Inc., and Edward C. Muelhaupt, Jr., Defendants-Appellees.
DES MOINES COLD STORAGE CO. INC., Plaintiff-Appellee,
v.
GLENNS, INC., Defendant-Appellee.
 No. 88-4430.
 United States Court of Appeals,
Fifth Circuit.
 July 5, 1989.
 
 E. Clifton Hodge, Jr., Jackson, Miss., for plaintiff-appellant.
 David M. Ott, Dan W. Webb, Tupelo, Miss., for Des Moines & Muelhaupt.
 Appeal from the United States District Court for the Northern District of Mississippi.
 Before WISDOM, KING and WILLIAMS, Circuit Judges.
 WISDOM, Circuit Judge:
 
 
 1
 * In this case we consider whether a party with limited involvement in a pork brokering arrangement is a seller of a security under 15 U.S.C. Sec. 77l (2). The district court concluded that seller status and liability under section 12(2) of the Securities Act of 1933 extends only to the pork broker who solicited the plaintiff's investment in the broker's commodity fund. The plaintiff also asks us to hold liable as a seller under section 12(2) the warehouse company that deposited his investment funds and provided storage and purchase money loans to the broker.
 
 
 2
 Des Moines Cold Storage Co. (DMCS) operates a warehouse in which dealers and brokers store meat products until sold. Glenns, Inc. (Glenns) is a pork broker that purchases pork products from packing houses and often stores the pork in the DMCS warehouse until sold. When Glenns bought pork from a packing house it furnished 25 percent of the purchase price. In line with its customary practice, DMCS financed the remaining 75 percent of the cost and took a security interest in the pork. Glenns had the pork shipped to DMCS for storage and DMCS issued Glenns a non-negotiable warehouse receipt. After arranging a sale, Glenns paid storage and insurance fees to DMCS and repaid the amount of the purchase price DMCS financed plus interest. The president of DMCS, Edward C. Muelhaupt, Jr., often released the pork to a buyer two or three weeks before receiving payment from Glenns.
 
 
 3
 B.J. Crawford, a poultry broker in Water Valley, Mississippi, became acquainted with Deryle Glenn, president of Glenns, Inc., in connection with Crawford's business of buying and selling chickens. In the fall of 1983, Deryle Glenn called Crawford and told him that for a $25,000 investment Crawford could obtain a share in Glenns's new "commodity fund" or limited partnership. Glenn stated that investors' funds would be used to supply 25 percent of the purchase price of pork bought for the fund and that DMCS would finance the remaining 75 percent of the cost. Glenn told Crawford that others, including Merrill Lynch, had already invested in the fund.
 
 
 4
 Later Glenn called Crawford and Crawford agreed to invest $100,000 to purchase four units in the limited partnership/commodity fund. As instructed by Glenn, Crawford mailed four checks, each in the amount of $25,000, to DMCS. Crawford sent his checks without a cover letter explaining what DMCS was to do with the money. Upon receipt of the checks Muelhaupt called Crawford and Crawford told him to put the money in Glenns's account. Glenn had already told Muelhaupt to use Crawford's funds as margin money for the commodity fund that he was trying to set up. The checks were cashed and the funds deposited in a bank account of DMCS.
 
 
 5
 Although Glenn told Crawford that DMCS was financing 75 percent of the purchase price of pork, Glenn arranged with Muelhaupt for DMCS to advance 90 percent of cost. Glenn instructed Muelhaupt not to tell Crawford of the changed margin requirement. But Muelhaupt later sent Crawford a "recap" sheet showing that Crawford's $100,000 had been used to buy $992,062.07 worth of pork products. In accordance with Crawford's and Glenn's requests, DMCS stopped sending reports to Crawford. Glenns supplied all the remaining "commodity fund" reports received by Crawford.
 
 
 6
 Glenns, Inc. sent Crawford checks drawn on its account in the amount of $22,693.18 for "profits on sales" and "interest on" Crawford's investment. Crawford received no money from Muelhaupt or DMCS. Crawford testified that when a report showed his profit at $64,000 he asked Glenn to sell. Glenn, who exercised complete control over the purchases and sales of the pork products, did not sell the pork at that time.
 
 
 7
 In April or August 1984 Crawford received three loads of hams from Glenns through a "transfer in storage". Crawford testified that he was sure he paid for the hams and that he sold them to Stone Commodities Co. of Chicago for about $50,000. As requested by Crawford, DMCS and Glenns released the stored hams to Stone Commodities.
 
 
 8
 In October 1984 Glenns asked DMCS to release six loads of stored hams to Peat Packing Co. DMCS issued the release and sought payment of the $94,000 Glenns owed on the notes secured by the hams. On November 23, 1984 Glenns still had not paid. DMCS foreclosed on Glenns's collateral stored in the warehouse and began selling it. Crawford learned of Glenns's default and requested and received from Muelhaupt a list of Glenns's remaining inventory in the warehouse. Muelhaupt testified that when DMCS seized Glenns's collateral in November none of the inventory purchased with Crawford's funds remained in storage.
 
 
 9
 Crawford brought suit against Deryle Glenn, Glenns Inc., Des Moines Cold Storage Company, Inc., and Edward C. Muelhaupt, Jr. alleging federal and state securities law violations. The district court held that Deryle Glenn and Glenns, Inc. are liable under 15 U.S.C. Sec. 77l (2) and analogous state law prohibiting a seller of a security from omitting or misrepresenting a known material fact about the investment. Glenn and Glenns, Inc. were also held liable under federal Rule 10(b)-5 and the corresponding state antifraud provisions. The district court concluded that DMCS and Muelhaupt were not "sellers" of a security under section 12(2) of the Securities Act of 1933 or under state law and that they did not violate nor aid and abett Glenn's and Glenns, Inc.'s violations of the antifraud provisions.
 
 
 10
 On appeal Crawford argues that the district court erred in holding that DMCS and Muelhaupt were not "sellers" of a security and in finding these defendants free from culpability under Rule 10(b)-5 and the Mississippi antifraud provision. Additionally Crawford challenges the court's determination of the amount he is entitled to recover from Glenn and Glenns, Inc. The parties concede that the district court's opinion contains some factual inaccuracies; we have therefore scrutinized the record. We discuss below, however, only the plaintiff's points arguably having merit.[1]
 
 II
 
 11
 A. The plaintiff argues that the court erred in holding that only Glenn and Glenns, Inc. meet the definition of a seller of a security under section 12(2) of the Securities Act of 1933.[2] The plaintiff concedes that before he decided to invest he spoke only with Deryle Glenn about the characteristics of the Glenns commodity fund/limited partnership. Crawford contends, however, that Muelhaupt and DMCS were sellers either because they were in privity with Crawford or alternatively because they offered, through Glenn, to sell Crawford an investment contract.
 
 
 12
 Because the parties do not contest the court's conclusion that Crawford's investment in Glenns's pork brokering business involved the purchase of a security we discuss only whether DMCS or Muelhaupt was a seller of the security. This Court has recently reformulated the test for "seller" status under section 12(2) in the light of the Supreme Court's decision in Pinter v. Dahl.[3] In Abell v. Potomac Insurance, Co.,[4] we concluded that the Pinter Court's analysis of who is a seller under section 12(1) is applicable in the section 12(2) context.[5] As Abell teaches, to determine who is a seller of the pork commodity fund/limited partnership units to Crawford we must answer two questions: (1) "Who passed title to the plaintiff [Crawford] or solicited the transaction in which title passed; and (2) from whom did the plaintiff [Crawford] buy the security?"[6] These questions focus on the seller as being either one who owns a security and transfers it for consideration or one who successfully promotes or solicits the purchase "motivated at least in part by a desire to serve his own financial interests or those of the securities owner".[7]
 
 
 13
 The essence of Crawford's argument on appeal is that by accepting, negotiating, and depositing his checks for $100,000 in a DMCS bank account, DMCS and Muelhaupt are in privity with him regarding his purchase of an "investment contract",[8] consisting of an interest in Glenns's commodity fund/limited partnership. In making his privity argument Crawford relies primarily on this Court's decision in Johnson v. Yerger.[9] That case involved a sale of stock in which the owner of the shares, to keep his identity secret, transferred title to the stock to a broker, Yerger, who then sold it to the plaintiff. Although he had no communication with the purchaser before the sale, Yerger received the purchaser's funds and transferred title to the stock to the purchaser. The sale was arranged by another person, Wilson; Yerger made no affirmative recommendation or suggestion to buy to the purchaser.
 
 
 14
 Thus, Crawford contends that Yerger's role, which made him a "seller", is roughly the same as Muelhaupt's participation in this transaction. Muelhaupt did not communicate with Crawford but he, like Yerger, did receive and deposit the funds. Although a conduit Yerger was the legal owner of the shares at the time of the transfer. Unlike Yerger, Muelhaupt did not have a title to transfer to Crawford. Moreover, the money received by DMCS from Crawford was used by Glenns to purchase pork products.
 
 
 15
 This situation is not analogous to that in Johnson v. Yerger. The security involved here, a type of investment contract, is not like stock; there is no tangible document evidencing ownership or title. To determine whether the type of interest Crawford, Muelhaupt, and DMCS had in the Glenns pork commodity fund is a security, we apply the test set forth in S.E.C. v. W.J. Howey, Co.[10] With regard to Crawford the Glenns commodity fund meets the Howey test: Crawford invested money in a common enterprise expecting to earn profits solely from the efforts of others.
 
 
 16
 Muelhaupt and DMCS, however, had a different involvement in the project. DMCS took Glenns as a client and treated Glenns the same way it treated others. DMCS is in the cold storage business; its profits are derived from storage fees and interest charged on advances it makes to brokers to purchase meat products for resale. It customarily takes a security interest in the collateral stored in its warehouse, issues warehouse receipts, and releases products for shipment when a sale is arranged.
 
 
 17
 Although its margin requirement may have been more relaxed for Glenns than for other customers, the increased storage fees and interest are not "profits" in the sense contemplated in Howey. Profits in the securities investment context means capital appreciation of the initial investment or participation in the earnings of the enterprise.[11] Acting as a creditor DMCS financed 90 percent of the cost of pork Glenns purchased and stored in the DMCS warehouse. The loans, evidenced by demand notes executed by Glenns, Inc., were secured by Glenns's inventory stored in the DMCS warehouse.
 
 
 18
 The plaintiff argues that DMCS is a participant in the securities transaction because it acted unlike a bank--a bank does not store meat products or deposit checks into its own account. That DMCS engaged in these activities, however, tends to show it acted as an entrepreneur rather than an investor.[12] DMCS generated profits from its own efforts; it did not put its capital at risk with the expectation of earning a profit solely from the efforts of others. Setting aside its warehouse operation, DMCS's lending activities were similar to those of the bank in Schlifke v. Seafirst Corp.[13] The bank in Schlifke financed a limited partnership's oil and gas exploration in a manner designed to secure investors a tax deduction without a cash outlay. To secure its loan to the partnership the bank obtained letters of credit from investors, equivalent to 116 percent of each investor's financial commitment to the program. The Court rejected the plaintiff's argument that the bank was a section 12(2) seller of an investment contract. It concluded that despite the bank's receipt of interest on its loan to the exploration program, it was not a party to an investment contract because it did not have the expectation of profit required by Howey.[14]
 
 
 19
 DMCS was not an investor in the Glenns commodity fund/limited partnership. Moreover, DMCS had no title or other document representing an ownership interest in the commodity fund that it could transfer to Crawford. Although depositing Crawford's checks in one of its own bank accounts looks suspicious when viewed in isolation, it is clear that Glenns, and not DMCS, exercised control over the funds, using the money to purchase pork products for resale. We conclude that DMCS and Muelhaupt were not parties to and did not pass title to the commodity fund investment contract to Crawford for value.
 
 
 20
 We also conclude that neither DMCS nor Muelhaupt "sold" the Glenns commodity fund units to Crawford.[15] Muelhaupt had no communication with Crawford before Crawford decided to invest and sent checks to DMCS. Deryle Glenn told Crawford that DMCS would act as a lender by advancing funds needed to purchase pork products and would store the meat until a sale was arranged. There is no merit to Crawford's argument that DMCS through Glenns offered or sold Crawford a security.[16]
 
 
 21
 B. The plaintiff also appeals the district court's denial of his motion to amend the judgment or alternatively for a new trial. The district court awarded Crawford rescissionary type damages measured by the difference between the amount invested and the amount Crawford received on his investment. Crawford challenges not the formula used, which generally applies in both section 12(2) and Rule 10(b)-5 cases, but the court's deduction of $50,000 which it considered a return on Crawford's investment. The deduction was improper, Crawford maintains, because the defendants did not plead affirmatively as required by Fed.R.Civ.P. 8(c) that the transfer in storage to Crawford of $50,000 in pork products from the Glenns inventory in the DMCS warehouse was a return of Crawford's capital invested.
 
 
 22
 The district court ruled that because evidence relating to the transfer in storage and Crawford's subsequent sale of the products to Stone Commodities was introduced without objection, under Fed.R.Civ.P. 15(b), the issue of the effect of the transfer on Crawford's damages is treated as having been tried by the implied consent of the parties.
 
 
 23
 Generally a finding of implied consent " 'depends on whether the parties recognized that an issue not presented by the pleadings entered the case at trial' ".[17] If a party fails to object because he does not recognize the significance of the evidence introduced, however, he cannot be said to have consented impliedly to the trial of the unpleaded issues suggested by it.[18] Of course, his inability to comprehend the significance of the evidence must be reasonable in the circumstances presented. For example, implied consent is not found where evidence introduced is relevant to a pleaded issue and the nonobjecting party has no notice that the evidence is intended to raise a new unpleaded issue into the case.[19]
 
 
 24
 The district court concluded that "the only reason this evidence [of the transfer of $50,000 of pork] was admitted was to show that Crawford had suffered less damages than he alleged" and that by failing to object he consented to the admission of this evidence for this purpose. We disagree with the court's ruling that the issue of the effect of the pork transfer and later sale on the amount of Crawford's loss was tried with Crawford's implied consent.
 
 
 25
 A careful review of the record reveals two occasions on which defense counsel for DMCS elicited testimony about the transaction. The first instance occurred during cross-examination of Crawford. This questioning, which yielded Crawford's acknowledgement that he received the pork from Glenns's account at DMCS and sold it to Stone Commodities, arguably is related to the issue of Crawford's loss. Immediately after asking Crawford about the mechanics of the transfer and sale, however, DMCS's counsel questioned Crawford about whether DMCS or Muelhaupt played a part in this sale:
 
 
 26
 Defense counsel: Do you know whether Chuck Muelhaupt or Des Moine Cold Storage had any controlling factor or decision-making authority over purchasing and selling pork on your account?
 
 
 27
 Crawford: There, I don't know.
 
 
 28
 * * *
 
 
 29
 * * *
 
 
 30
 Defense counsel: Do you know ... of Chuck Muelhaupt or Des Moines Cold Storage ever directing any sale or purchase of pork using your money?
 
 
 31
 Crawford: That I do not know.
 
 
 32
 Later in the trial, Muelhaupt testified on direct examination that Crawford arranged with Glenns for the pork to be transferred from Glenns to Crawford to Stone Commodities. When asked about his relationship or involvement with this deal Muelhaupt emphasized that DMCS only received the money due on its loans and had no control over or involvement in other aspects of the sale.
 
 
 33
 On neither of these occasions did defense counsel alert the court or the plaintiff that he was addressing the amount of Crawford's damages.[20] It is apparent that counsel for the plaintiff was confused about the purpose of Crawford's cross-examination about the transfer in storage. When counsel for DMCS offered into evidence documents relating to the transfer of $50,000 of pork to Crawford, Crawford's attorney complained:
 
 
 34
 Your Honor, I have never seen this document, I don't know what the purpose of this is. We have had documents marked on the pretrial order, and--I don't have any idea what all of this is about.
 
 
 35
 Defense counsel then stated that the documents need not be admitted into evidence because Crawford had acknowledged receiving title to the pork.
 
 
 36
 Although plaintiff's counsel did not object to the cross-examination of Crawford about the Stone Commodities sale, the record discloses that he did not realize the purpose for which the testimony was elicited. Defense counsel followed up with questions about Muelhaupt's and DMCS's lack of control over the Glenns account or Crawford's funds. That counsel for Crawford failed to recognize the significance of the testimony in relation to the question of damages is reasonable. Much of the testimony related to the level of participation or involvement DMCS and Muelhaupt had in the transaction, was facts highly relevant to the pleaded issues of these defendants' potential liability under section 12(2) and Rule 10(b)-5. We conclude that the issue of the effect of the Stone Commodities transaction on Crawford's damages was not tried with the implied consent of Crawford.
 
 
 37
 * * *
 
 
 38
 * * *
 
 
 39
 We REVERSE the portion of the district court's judgment regarding damages and remand the case for further proceedings on the issue. We AFFIRM the court's judgment in all other respects.
 
 
 
 [1]
 We reject the plaintiff's argument that Muelhaupt and DMCS are liable as aiders and abettors of Deryle Glenn's and Glenns Inc.'s Rule 10(b)-5 violation. DMCS did not owe a fiduciary duty to Crawford. Muelhaupt did send Crawford a recap sheet showing that Crawford's $100,000 was used to purchase almost $1,000,000 in pork products. Muelhaupt's and DMCS's silence about Glenns's bad business practices and the true character of the commodity fund, although censurable, falls far short of knowingly rendering "substantial assistance" to Glenns's fraud. The plaintiff has failed to show that DMCS or Muelhaupt acted with a desire or conscious intent that the scheme succeed. See Abell v. Potomac Ins. Co., 858 F.2d 1104, 1126-28 (5th Cir.1988)
 
 
 [2]
 Section 12(2) provides:
 Any person who--
 * * *
 (2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,
 shall be liable to the person purchasing such security from him, who may use either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security.
 
 
 [3]
 --- U.S. ----, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). In Pinter the court acknowledged that most courts have defined the class of defendants under Sec. 12(2) as being the same as under Sec. 12(1). The Court declined, however, to address whether the classes of defendants under these sections are coextensive
 
 
 [4]
 858 F.2d 1104, 1115 (5th Cir.1988)
 
 
 [5]
 As we noted in Abell this Court previously had defined a "seller" under section 12(1) & (2) as including a person whose participation in the security transfer is a "substantial factor" in bringing about the sale. Abell, 858 F.2d at 1115 n. 9
 
 
 [6]
 Abell, 858 F.2d at 1114
 
 
 [7]
 See id. (quoting Pinter v. Dahl, --- U.S. ----, ----, 108 S.Ct. 2063, 2078-79, 100 L.Ed.2d 658, 682 (1988)). See also Schlifke v. Seafirst Corp., 866 F.2d 935, 940 (7th Cir.1989)
 
 
 [8]
 An investment contract has been defined by the Supreme Court as:
 a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise.
 Securities Exchange Comm'n v. W.J. Howey Co., 328 U.S. 293, 298-99, 66 S.Ct. 1100, 1102-03, 90 L.Ed. 1244, 1249 (1946).
 
 
 [9]
 612 F.2d 953 (5th Cir.1980)
 
 
 [10]
 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946)
 
 
 [11]
 See Schlifke v. Seafirst Corp., 866 F.2d 935, 941-42 (7th Cir.1989); Hunssinger v. Rockford Business Credits, Inc., 745 F.2d 484, 490 (7th Cir.1984); United Housing Found. Inc. v. Forman, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975). See also Arthur Young & Co. v. Reves, 856 F.2d 52, 54-55 (8th Cir.1988)
 
 
 [12]
 See Siebel v. Scott, 725 F.2d 995, 999 (5th Cir.1984), cert. denied, 467 U.S. 1242, 104 S.Ct. 3515, 82 L.Ed.2d 823 (1984). In Siebel we noted that under Howey whether an interest is characterized as a security depends on the relationship of a holder to the venture. If a holder relies on his own entrepreneurial talents to produce income his interest is not treated as a security because he is not within the class of persons Congress intended to protect
 
 
 [13]
 866 F.2d 935 (7th Cir.1989)
 
 
 [14]
 Id. at 941-42
 
 
 [15]
 See generally Arthur Young & Co. v. Reves, 856 F.2d 52, 55 (8th Cir.1988)
 
 
 [16]
 Muelhaupt's likely awareness that Glenns enticed Crawford to invest by telling Crawford that DMCS would finance a large part of the purchase price of the pork is insufficient to support a finding that DMCS indirectly solicited Crawford's investment. See generally Marshall v. Quinn-L Equities, Inc., 704 F.Supp. 1384 (N.D.Tex.1988) (Privity was found lacking where law firm prepared private placement memoranda and accompanying tax documents but had no direct communication with purchasers amounting to solicitation.)
 There is also no evidence that DMCS, before or at the time Crawford decided to invest, supplied directly or indirectly any information to Crawford about any aspects of the Glenns commodity brokering partnership. DMCS's financing and storage activities may have been necessary to the operation of the Glenns commodity program but they cannot properly be considered as having induced Crawford to invest. See Babst v. Morgan Keegan & Co., 687 F.Supp. 255, 262 (E.D.La.1988).
 
 
 [17]
 Domar Ocean Transp. v. Independent Refining Co., 783 F.2d 1185, 1188 (5th Cir.1986) (quoting Jimenez v. Tuna Vessel GRA-NADA, 652 F.2d 415 (5th Cir.1981))
 
 
 [18]
 Id.; 6 C. Wright & A. Miller, Federal Practice and Procedure: Civil Sec. 1493 at 468-69 (1971)
 
 
 [19]
 Domar, 783 F.2d at 1188; International Harvester Credit Corp. v. East Coast Truck & R.V. Sales, Inc., 547 F.2d 888, 890 (5th Cir.1977); Jimenez, 652 F.2d at 421; Bernard v. Florida East Coast Ry. Co., 624 F.2d 552, 555 (5th Cir.1980)
 
 
 [20]
 We are also mindful that prior to the issuance of its order the court gave no notice to the plaintiff that it was inclined to take into consideration the Stone Commodities transaction in calculating any damages to which Crawford might be entitled. The vague relevance of defense counsel's questioning and the court's silence and later reduction of the damage award by an amount not suggested in the pleadings supports Crawford's argument that he was not put on notice about the intended use of this evidence. See Luria Bros. & Co. v. Alliance Assurance Co., Ltd., 780 F.2d 1082, 1089 (2d Cir.1986)