**In re RAC MORTGAGE INVESTMENT CORPORATION SECURITIES LITIGATION.**

**No. MDL–824.**

United States District Court, D. Maryland.

May 15, 1991.

Stanley R. Wolfe, Stephen Ramos, Berger & Montague, P.C., Philadelphia, Pa., Bruce Gerstein, Scott Fisher, Garwin, Bronzaft, Gerstein & Fisher, Eugene Spector, Paul Scarlato, Eugene A. Spector & Associates and Joel Berstein, Kantor, Berstein & Kantor, New York City, of counsel; William Sammons, John Isbister, Tydings & Rosenberg, Charles Piven, Cohan & Francomano, Baltimore, Md., Richard Schiffren, Schiffren & Craig, Chicago, Ill., Robert Roseman, Mark Goldman, Rudolph, Seidner, Goldstein, Rochestie & Salmon, P.C., Philadelphia, Pa., Margaret Dobies, Berman, Delvalerio & Pease, Boston, Mass., Steven Toll, Cohen, Milstein, Hausfeld & Toll, Washington, D.C., Lawrence Sucharow, Frederick Eisenberg, Goodkind, Labaton & Rudoff, Robert Harwood, Wechsler, Skinrnick, Harwood, Halebian & Feffer, Stephen Oestreich, Wolf, Popper, Ross, Wolf & Jones, Mark Gardy, Abbey & Ellis, Joseph Weiss, New York City, and R.J. Coughlan, Coughlan, Semmer & Lipman, San Diego, Cal., for plaintiffs.

Charles E. Davidow, Mark Cahn, Wilmer, Cutler & Pickering, Washington, D.C., James Farnham, Randolph Totten, Huton & Williams, Richmond, Va., Francis Burch, Jr., Piper & Marbury, and Andrew Graham and Lee Ogburn, Kramon & Graham, Baltimore, Md., for defendants.

## MEMORANDUM

MOTZ, District Judge.

This is a class action brought on behalf of persons who purchased shares of the common stock of RAC Mortgage Investment Corporation ("RAC") in an initial public offering ("IPO") in February 1988, a

second public offering ("SPO") in September 1988, and in the open market from the date of the IPO until June 26, 1989. The defendants are RAC and various officers and directors of RAC (the "RAC defendants"); The Ryland Group, Ryland Mortgage Company, Ryland Acceptance Corporation and various officers and directors of those three companies (the "Ryland defendants"); and Prudential–Bache Securities, Inc. and four other brokerage firms (the "underwriter defendants"). Plaintiffs allege violations of §§ 11 and 12(2) of the Securities Act of 1933 and § 10(b) of the Securities and Exchange Act of 1934, as well as various common law claims against all the defendants.

All defendants have moved to dismiss all of the claims. However, the underwriter defendants have reached a settlement in principle with plaintiffs and are in the process of finalizing the settlement papers. Therefore, this opinion addresses only the motions to dismiss filed by the RAC defendants and the Ryland defendants.[1]

## I.

RAC is a real estate investment trust.[2] It is managed by Ryland Acceptance Corporation, which is a subsidiary of Ryland Mortgage Company, which is in turn a subsidiary of The Ryland Group. Pursuant to a prospectus dated February 10, 1988, RAC sold 8,200,000 shares of its common stock in the IPO for $10 per share. Pursuant to a second prospectus dated September 23, 1988, RAC commenced the SPO, offering its stock at $9.75 per share. The SPO was completed on September 30, 1988.

RAC earns income for its shareholders primarily through the creation or purchase of what are known as "residual interests" or "residuals." To create a residual, RAC purchases a right to receive the payments from a pool of mortgages. It then issues collateralized mortgage obligations ("CMOs") which are, in essence, several series of bonds. The interest rates on the CMOs are set at a level where payments under them are less than what is anticipated to be the income received from the pool of mortgages. The "residual" is the difference between what is taken in and what is paid out. The dividends (if any) received by shareholders of RAC depend upon there being a positive net cash flow.

Consequently, RAC's profitability is sensitive to interest rate fluctuations. For example, if long-term interest rates decrease, the number of mortgagors who repay their loans (by obtaining refinancing) is likely to increase. This trend adversely affects RAC's cash flow. Similarly, a rise in short-term interest rates adversely affects RAC on the payment side since some of the CMOs which it issues carry a variable rate.

Unfortunately, during the months following the SPO, interest rates fluctuated in a manner which heavily impacted upon RAC's profitability. Specifically, long-term interest rates decreased, resulting in substantial prepayments of the mortgages held by RAC, while at the same time short-term interest rates rose, increasing the payments RAC was required to make on the CMOs it had issued. As a result, the price of RAC stock (which had been trading in the $8 per share range at year-end 1988) closed at $4.625 on June 23, 1989. It plummeted to $2.625 per share on June 26, 1989.[3]

## II.

■ Plaintiffs first assert that defendants violated § 11 of the Securities Act of 1933, 15 U.S.C. § 77k, by issuing prospectuses in connection with the IPO and SPO which contained untrue statements of material fact and omitted to state material

---

1. This case was originally assigned to the Honorable Frank A. Kaufman. Judge Kaufman had to disqualify himself, and the case was reassigned to me on March 3, 1991.

2. The facts as stated in this opinion are based upon the allegations in plaintiffs' second consolidated amended and supplemental complaint and upon documentary exhibits whose authenticity is undisputed.

3. The stock has since rebounded and was again trading in the $8 range on May 3, 1991, the day on which the motions hearing in this case was held.

facts necessary to make the statements made not misleading. Under § 11 plaintiffs need only show a material misstatement or omission to establish a *prima facie* case. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983).

The gravamen of plaintiffs' claim is that the prospectuses did not fully disclose the risks for potential investors presented by fluctuations in interest rates. This claim cannot withstand even casual scrutiny. The front page of both prospectuses stated in bold type that "The purchase of shares offered hereby is subject to certain risks. See 'Risk Factors'." There followed in the body of the prospectuses seven and one-half pages specifying various "Risk Factors" to which the value of the offered shares was subject. The first substantive paragraph of that section stated that "The ability of the Company to purchase Mortgage Assets and to generate income therefrom will be affected by various factors, some of which will be beyond the control of the Company." The second paragraph stated that "Because the Company's intended activities will be influenced by interest rates, the operating results of the Company will depend, in large part, upon the ability of the Company and the Manager [Ryland Acceptance Corporation] to respond to fluctuations in market interest rates and to utilize appropriate strategies to maximize returns to the Company while attempting to minimize risks." The next paragraph stated that "If market interest rates increase subsequent to the acquisition of such Mortgage Instruments, or the making of a commitment to do so, the Mortgage Instruments so acquired will yield less than prevailing market rates." The paragraph went on to spell out the effect that this would have upon RAC's operations. The paragraph concluded by stating that "the Company may utilize hedging techniques to protect against risks created by fluctuations in market interest rates" but cautioned that "no hedging strategy can completely insulate the Company from such risks" and that "certain of the tests that the Company must satisfy to qualify as a REIT [real estate investment trust] may limit the Company's ability to hedge."

The fourth paragraph of the "Risk Factors" section of the prospectuses stated that "If market interest rates for Mortgage Instruments decrease subsequent to the issuance of such commitments, many borrowers may seek new loans at the lower market rates then prevailing, and a substantial percentage of the Mortgage Instruments covered by the Company's commitments may not be funded." Again, the potential effects of this occurrence were explained, and it was explicitly stated that "[i]n such event, the earnings of the Company may be adversely affected." The fifth and sixth paragraphs similarly address the problems of mortgage repayments stating, *inter alia,* that

In general, ... prepayments on Mortgage Instruments underlying an issue of Structured Securities [CMOs] bearing a higher net interest rate than the highest interest rate on the series of Structured Securities secured thereby ... will have a negative impact on the net cash flows of the Company.... In addition, net cash flows on Mortgage Instruments securing Structured Securities or Residual Interests also tend to decline over the life of a series of Structured Securities because classes thereof with earlier stated maturities tend to have lower interest rates.... With respect to classes of a series of Structured Securities which bear variable rates of interest, an increase in interest rates above those used in projecting the net cash flows from series of Structured Securities may adversely affect such residual cash flows. No assurance can be given as to the actual prepayment rate of Mortgage Loans included or underlying the Mortgage Instruments securing a series of Structured Securities with respect to such Structured Securities or the variable rates of interest or reinvestment rates.

I will not mention every reference in the prospectuses to the potential effects of changing interest rates. Those portions which I have quoted are sufficient to dem-

onstrate that the prospectuses adequately disclosed the risks presented. Of course, the prospectuses make somewhat tedious reading. However, this is due to the nature of the subject matter being discussed, not to any attempt on the part of the defendants to obscure what is being said.

The particular challenges which plaintiffs make to the prospectuses' disclosures are insubstantial.

First, plaintiffs allege that the prospectuses fail to describe the magnitude of the risk posed by interest rates in terms which plaintiffs believe should have been used, such as "extreme sensitivity," "potentially devastating," "especially vulnerable" and "dramatic." The law is clear that prospectuses need not characterize a security or a risk in a pejorative manner. As has been recently stated, "Whether or not a company used the adjective plaintiff chooses should not be the focus of the Court's inquiry." *In re Seagate Tech. II Sec. Litig.*, [1989 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,502, at 93,201, 1989 WL 222969 (N.D.Cal. May 3, 1989). *See also Goldberg v. Meridor*, 567 F.2d 209, 218 n. 8 (2d Cir.1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1249, 55 L.Ed.2d 771 (1978).

Second, plaintiffs contend that a prospectus (not one of those at issue here) for a residual which RAC itself owned and offered to sell to institutional investors in connection with its issuance of CMOs more clearly stated the risks posed by high short-term interest rates and a rapid rate of principal payments on the underlying mortgage loans. The short answer to this contention is that, assuming that the statement in this prospectus was in fact more clear, that fact alone does not render the statements in the IPO and SPO prospectuses false or misleading.[4] *See, e.g., Greenapple v. Detroit Edison Co.*, 618 F.2d 198, 211 (2d Cir.1980). Moreover, plaintiffs are comparing two dissimilar securities. The prospectus pointed to by plaintiffs related to a residual which was particularly vulnerable to changes in short-term rates. In contrast, the effect of high short-term rates on the value of RAC stock was less certain since RAC had a managed and diversified portfolio. Thus, the potential effects of high short-term interest rates on the value of RAC stock was somewhat less predictable, and the more general language in the IPO and SPO prospectuses—which clearly cautioned prospective investors about possible risks—was entirely appropriate.

Third, plaintiffs fault the prospectuses on the ground that they indicated that fluctuating interest rates "may" affect the value of RAC stock rather than stating that they "shall" affect such value. Again, because of the managed and diversified nature of RAC's portfolio, the choice of verbs cannot be said to have been false or misleading. At best, plaintiffs are quibbling about semantics.

Fourth, plaintiffs complain that the prospectuses did not address potential "non-uniform" changes in interest rates, *i.e.* the fact that long-term interest rates could decrease while short-term interest rates could simultaneously rise. Defendants were required to make no such disclosure. As the Seventh Circuit has stated, "Securities laws require issuers to disclose *firm-specific* information; investors and analysts combine that information with knowledge about the competition, regulatory conditions, and the economy as a hold to produce a value for stock." *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 515 (7th Cir.1989) (emphasis in original).

Fifth, while conceding that faulty projections will not in general support a claim under the federal securities laws, *see, e.g., Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 117–18 (2d Cir.1982); *Boley v. Pineloch Assoc. Ltd.*, 700 F.Supp. 673, 679 (S.D.

---

**4.** The same is true as to an internal Ryland Group memorandum dated December 1, 1987 to which plaintiffs refer as demonstrating their preferred description of the risks presented by changes in interest rates. Moreover, that memorandum was written before RAC was formed and contemplated a portfolio different from the one which actually came into being. Further, although the memorandum did directly relate percentage changes in interest rates to corresponding changes in the rate of return on residuals, it was written in a cryptic style not immediately comprehensible to a lay person.

N.Y.1988), plaintiffs contend that the yield projections in the prospectuses were deceptive and misleading because they failed to include in their matrix figures showing the substantial effect which a small change in interest rates would have upon the company's revenues. The projections in the prospectuses were accompanied by disclaimers which repeatedly warned that the illustrated projections could differ materially from actual results; moreover, the assumptions upon which the projections were based were fully disclosed. As such, the yield projections cannot be said to have been deceptive or misleading.

Finally, plaintiffs assert that the presence of the word "conservative" in the prospectuses was misleading. However, that adjective was used only as a modifier to the word "management," and plaintiffs have not alleged that RAC was not conservatively managed. In that regard, plaintiffs have not disputed that, as asserted by defendants, RAC (unlike several other real estate investment trusts) was able to withstand the financial difficulties which it encountered because it was not highly leveraged.

In *In re American S.W. Mortgage Litig.*, Civil No. 89–462 TUC–RMB (D.Ariz. July 11, 1990), Judge Bilby considered prospectuses virtually identical to those involved here and concluded that they were not false or misleading. I fully concur in his views. The premise of § 11 is that prospective investors will read a prospectus. Anyone who took the time to read the prospectuses for RAC's IPO and SPO with even minimum care would certainly have been alerted to the potential effects of changing interest rates upon RAC's profitability. They cannot in good conscience assert the contrary.

**III.**

Plaintiffs' claim that defendants violated § 12(2) of the 1933 Act, 15 U.S.C. § 77*l*(2), depends upon a threshold finding that the IPO and SPO prospectuses were false or misleading.[5] Since I find this not to be so, plaintiffs' § 12(2) claims fails. Similarly, since plaintiffs' counsel (with commendable candor) conceded at oral argument that plaintiffs' § 10(b) claims based upon post-offering public announcements depend upon the prospectuses having been false or misleading in the first instance, these claims necessarily fail as well.[6]

In light of these rulings, I need not decide several ancillary issues raised by defendants. However, it may be in the interest of the expeditious resolution of this litigation for me to address those issues summarily in the event that my primary holding is reversed on appeal.

■ First, I am of the view that the "substantial factor" test does not apply in determining the identity of persons who are liable under § 12(2). Rather such "liability only extends to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter v. Dahl*, 486 U.S. 622, 647, 108 S.Ct. 2063, 2079, 100 L.Ed.2d 658 (1988). Although the Supreme Court used this language to define a statutory seller within the context of § 12(1), the Second, Third, Fifth and Ninth Circuits have all extended the definition to § 12(2). *See Wilson v. Saintine Exploration & Drilling Corp.*, 872 F.2d 1124, 1127 (2d Cir. 1989); *In re Craftmatic Sec. Litig.*, 890 F.2d 628, 636 (3d Cir.1989); *Crawford v. Glenns, Inc.*, 876 F.2d 507, 510 (5th Cir. 1989); *Moore v. Kayport Packaging Ex-*

**5.** Plaintiffs claim that Prudential–Bache and the other underwriter defendants circulated other statements in connection with the public offerings which misrepresented the nature of an investment in RAC stock. However, all that plaintiffs have alleged against the non-underwriter defendants in this regard is that several of RAC's representatives participated in Prudential–Bache's "roadshows." No specific misrepresentations are attributed to them, and they are not alleged to have participated in the prepara-

tion of the sales documents which are said to have been false or misleading. Thus, under Fed.R.Civ.P. 9(b), no claim has been stated against any of the non-underwriter defendants on this point.

**6.** It follows, *a fortiori*, that all of plaintiffs' pendent state claims against the RAC and Ryland defendants are likewise without basis.

*press, Inc.*, 885 F.2d 531, 536 (9th Cir.1989). Here, plaintiffs have not alleged sufficient facts to demonstrate that any of the defendants other than RAC (and the underwriter defendants) fall within § 12(2)'s terms.

Second, in connection with their § 10(b) claims, plaintiffs have failed to allege with sufficient specificity the role which each of the defendants (other than RAC, its officers and inside directors and Ryland Acceptance) played in the alleged fraud. *See* Fed.R.Civ.P. 9(b); *Smith v. Ayres,* 845 F.2d 1360, 1365 (5th Cir.1988). All they have done is to make conclusory averments based upon the fact that the defendants are in some way associated with one another. This is insufficient. *See generally DiVittorio v. Equidyne Extractive Indus.,* 822 F.2d 1242, 1248–49 (2d Cir.1987); *O'Brien v. National Property Analysts Partners,* 719 F.Supp. 222, 226–29 (S.D.N.Y.1989); *Bruns v. Ledbetter,* 583 F.Supp. 1050, 1052 (S.D.Cal.1984).

Third, plaintiffs have likewise failed to allege sufficient facts to demonstrate that any of the defendants, other than RAC's officers and inside directors and Ryland Acceptance, is a "control person" over RAC within § 15 of the 1933 Act, 15 U.S.C. § 77o, or § 20 of the 1934 Act, 15 U.S.C. § 78t. *See generally Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1440 (9th Cir.1987); *Walker v. Cardinal Sav. & Loan Ass'n,* 690 F.Supp. 494, 500 (E.D.Va. 1988).

Fourth, even assuming that the IPO and SPO prospectuses were false or misleading in some respect, I am satisfied that the post-offering statements upon which plaintiffs rely to support their § 10(b) claims were not themselves false or misleading. The RAC defendants have fully explained the context in which the statements were made and the reasons for each of them. Plaintiffs have not refuted these explanations in any way. Many of the statements were made during a time when other real estate investment trusts which were more highly leveraged than RAC were being forced into bankruptcy. Viewed in the context in which they were made, these statements reflect nothing more than RAC's own view that its business was sound. This is not the stuff of which securities fraud is made.

I will enter an order effecting the rulings made in this memorandum after conferring with counsel. In light of the pending settlement between plaintiffs and the underwriter defendants, it appears appropriate that my order be entered pursuant to Fed. R.Civ.P. 54(b) in order to assure expeditious appellate review of my rulings.